MASSACHUSETTS MEDICAL
SOCIETY, et al., Plaintiffs,
Appellants,

v.

Michael S. DUKAKIS, et al.,
Defendants, Appellees.

No. 86–1575.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1986.

Decided March 30, 1987.

Jack R. Bierig, Chicago, Ill., with whom David F. Graham, Chicago, Ill., Carter G. Phillips, Washington, D.C., Sidley & Austin, Chicago, Ill., Thayer Fremont-Smith, Kenneth Laurence, Choate, Hall & Stewart, Boston, Mass., Kathleen R. Curtis, Waltham, Mass., Michael J. Kelly, Kirk B. Johnson and B.J. Anderson, Chicago, Ill., were on brief, for plaintiffs, appellants.

Carl Valvo, Asst. Atty. Gen., with whom Douglas H. Wilkins, Asst. Atty. Gen., and Francis X. Bellotti, Atty. Gen., Boston, Mass., were on brief, for defendants, appellees.

Ellen A. Bruce, with whom Jan Stiefel, Greater Boston Elderly Legal Services, Daniel S. Manning and Greater Boston Legal Services, Boston, Mass., were on brief, for intervenors Massachusetts Sr. Action Council, Inc. and Massachusetts Ass'n of Older Americans, Inc.

Before CAMPBELL, Chief Judge, BROWN,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

This case concerns the legal status of "balance billing" within the federal Medicare program. Balance billing is the practice by which a doctor bills a patient for the balance of the doctor's fee over and above the amount that the Medicare program has determined to be a "reasonable charge." Massachusetts has enacted a statute that forbids balance billing. Chapter 475 of the Massachusetts Acts of 1985 directs the Massachusetts Board of Registration in Medicine to

* Of the Fifth Circuit, sitting by designation.

require as a condition of granting or renewing a physician's certificate of registration, that the physician, who if he agrees to treat [a Medicare beneficiary], shall also agree not to charge or to collect from such beneficiary any amount in excess of the reasonable charge for that service as determined by the United States Secretary of Health and Human Services.

Mass.Gen.Laws ch. 112, § 2; *see also* Mass.Regs.Code tit. 243, § 2.07(15) (prohibiting charging to or collecting from Medicare patients any amounts in excess of the reasonable charge). Appellants in this case—the Massachusetts Medical Society, the American Medical Association, and an individual Massachusetts doctor (whom we shall refer to collectively as MMS)—have sued the Governor and other Massachusetts officials seeking a declaration that the statute is unconstitutional. They argue that it conflicts with the federal Medicare Act, which must prevail under the supremacy clause of the United States Constitution, Art. VI, cl. 2. The district court rejected their legal claims. *See Massachusetts Medical Society v. Dukakis*, 637 F.Supp. 684 (D.Mass.1986). We affirm its decision.

I

The federal Medicare Act preempts the Massachusetts ban on balance billing if and only if Congress intended it to do so. Our "sole task" here is to determine the intent of Congress. *California Federal Savings & Loan Association v. Guerra*, — U.S. ——, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (reviewing supremacy clause doctrine). Congress might show that it intends to preempt state law by *explicitly* withdrawing the power of states to regulate within certain fields. *See, e.g., Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Or, Congress might *implicitly* withdraw the states' power to regulate by creating a regulatory system so pervasive and complex that it leaves "no room" for the states to regulate. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Congress

might also enact a law such that "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), in which case the state statute must yield. Finally, the Supreme Court has noted that, even in the absence of a direct conflict, a state law violates the supremacy clause when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *see, e.g., Michigan Canners & Freezers Association v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 478, 104 S.Ct. 2518, 2527, 81 L.Ed.2d 399 (1984) (holding that a Michigan statute that requires producers to pay fees to a particular producers' association and to abide by the association's marketing contracts is preempted by a federal statute that forbids coercing producers to join a producers' association); *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 627, 638–39, 93 S.Ct. 1854, 1856, 1862, 36 L.Ed.2d 547 (1973) (holding that a local ordinance barring overnight take-offs and landings is preempted by the Federal Aviation Act, one purpose of which is to ensure the "efficient utilization" of airspace).

This case involves only the final—"state obstacle"—form of supremacy clause challenge. MMS has not argued, nor could it argue, that Congress *explicitly* preempted state authority in the field of fee regulation of medical services for the elderly. The first section of the Medicare Act explicitly states the contrary intent to minimize federal intrusion in the area. *See* 42 U.S.C. § 1395. Nor could MMS argue that Congress intended *implicitly* to withdraw the power of states to regulate medical fees. The field of medical fee regulation seems by tradition to be one of state concern. *See Massachusetts Nurses Association v. Dukakis*, 726 F.2d 41, 44 (1st Cir.1984) (noting that hospital cost containment is an interest " 'deeply rooted in local feeling and responsibility' " (quoting *San Diego Build-*

*ing Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959))); P. Starr, The Social Transformation of American Medicine 62 (1982) (noting that Massachusetts regulated medical fees as early as 1633). And, the Supreme Court has held that when Congress legislates "in a field which the States have traditionally occupied," courts must presume that Congress has not preempted state power to act unless that was Congress's "clear and manifest purpose." *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230, 67 S.Ct. at 1152. Finally, MMS does not claim that the federal Medicare Act and the Massachusetts statute challenged here place doctors under conflicting legal obligations.

MMS can and does argue, however, that the Massachusetts statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Medicare statute. *Hines v. Davidowitz,* 312 U.S. at 67, 61 S.Ct. at 404. MMS says that one purpose or objective of Congress was to create an "option" for doctors to balance bill, and they cite several cases holding that states may not frustrate options created or explicitly guaranteed by Congress. *See Lawrence County v. Lead-Deadwood School District,* 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985); *Michigan Canners & Freezers Association v. Agricultural Marketing & Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); *Fidelity Federal Savings & Loan Association v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Ridgway v. Ridgway,* 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981); *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962); *Franklin National Bank v. New York,* 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954); *Wissner v. Wissner,* 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950); *Hill v. Florida,* 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945); *First Federal Savings & Loan Association v. Greenwald,* 591 F.2d 417 (1st Cir.1979).

To prevail, MMS must show that Congress intended to create an "option" in the strong sense of that word: that Congress intended to create a legal *right* to balance bill, a right immune from significant state interference. MMS cannot win by showing only that Congress failed to disturb a preexisting legal status quo that happened to permit doctors to balance bill. We cannot infer from Congress's simple failure to disturb an existing practice that Congress meant to grant that practice the status of a right, immune from state regulation. MMS understands this point and undertakes to prove that Congress intended to create a balance billing "right" by making two general sorts of argument: that the language and history of the Medicare Act express Congress's intent to create a right immune from state interference, and that the basic underlying purpose of the Act implies such an intent.

### A

We first consider MMS's arguments that rest on statutory language and history. MMS points to language in the Medicare Act itself that seems to presume the existence of a balance billing option. The Act provides two mechanisms by which the Secretary of Health and Human Services—or to be more accurate, a Medicare insurance carrier—may pay a doctor for treatment of a Medicare beneficiary:

> [P]ayment will ... be made [by the carrier]—
>
> (i) on the basis of an itemized bill; or
>
> (ii) on the basis of an assignment under the terms of which ... the reasonable charge is the full charge for the service
>
> ....

42 U.S.C. § 1395u(b)(3)(B). Under either payment method, HHS pays 80 percent of the reasonable charge for the doctor's services. *See* 42 C.F.R. § 405.240(a)(1). If the doctor chooses the second payment method and accepts "assignment" of the patient's right to payment, the Medicare carrier will pay him directly 80 percent of the reasonable charge. In addition, the doctor may bill his patient for the remaining 20 percent of the reasonable charge.

But, he may not balance bill—he may not bill his patient for more than the reasonable charge. *See* 42 C.F.R. § 405.-1675(a)(1)(i). If the doctor instead chooses the first method of payment—if he submits an "itemized bill" to his patient—the patient will submit the doctor's bill and a claim for payment to the Medicare carrier, and the carrier will pay the patient 80 percent of the reasonable charge. *See* 42 C.F.R. § 405.1672(c). Under this method, the patient under ordinary contract law would have to pay the doctor's fee *including* any excess over the reasonable charge. In effect, a doctor who chooses assignment billing accepts the reasonable charge ceiling as a quid pro quo for assured direct payment from the government of 80 percent of that reasonable charge. *See* R. Myers, Medicare 122–23, 149 (1970). And, in effect, a doctor who chooses itemized billing accepts the risk of nonpayment or late payment by the patient in exchange for the "option" (as MMS puts it) to charge more than the reasonable charge. MMS says that the words "itemized bill," taken in context, create a statutory right to balance bill.

MMS points as well to statements made by legislators that it believes show a congressional intent to create a right to balance bill. MMS relies in particular on a statement made on the House floor in 1965 by Wilbur Mills, Chairman of the House Ways and Means Committee, as he introduced the Medicare legislation to Congress:

> [T]here is no intention to tell [doctors] what they may charge their patients.... [W]hat if the doctor says that what the insurer is paying, before he ever operates, is not sufficient to satisfy him? He might say "My fee is so much, $2000, but this cost that you are indemnified against is only $1000." What then? We pay 80 percent of that $1000 to the patient, and the patient pays the doctor $2000, including the payment under the plan.

111 Cong.Rec. 7214 (1965). Chairman Mills was a principal architect of the Medicare Act. His interpretation of the Act to allow doctors to bill over the reasonable charge is therefore an unusually authoritative one. And, we have found no congressional dis-

cussion surrounding passage of the Medicare Act that disputes this interpretation. To strengthen it further, MMS quotes a description of the 1965 Medicare Act made in a 1984 statement to Congress by Senator Kennedy:

> The fundamental compromise that permitted the passage of Medicare in 1965 ... was the bargain ... by which the American Medical Association permitted the Federal Government to pay a large share of the medical costs of the elderly, in return for which physicians would still be able to pursue additional private charges from their patients, free of Government restraint.

130 Cong.Rec. S5498 (daily ed. May 9, 1984).

Finally, MMS points out that in 1984 Congress rejected a proposal to end balance billing for doctor's services to Medicare inpatients. H.R. 4170, 98th Cong., 2d Sess. § 1006 (1984); *see* 1984 U.S.Code Cong. & Admin.News 1410–12; 130 Cong. Rec. H2860 (daily ed. Apr. 12, 1984). Instead of banning balance billing, Congress made the assignment method more attractive to those doctors who would agree to use it exclusively for periods of twelve months. *See* 42 U.S.C. §§ 1395u(b)(4)(D), (h)(1), (h)(2), (h)(3), (i)(2). But, Congress explicitly made the choice to enter this twelve-month commitment "voluntar[ ]y." *See* 42 U.S.C. § 1395u(h)(1).

In our view, the evidence MMS presents is not sufficient to show that Congress intended to create a *right* to balance bill—that it intended to preserve balance billing from state regulation, rather than simply to leave the current practice of balance billing undisturbed. The law makes clear that we must "start[ ] with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230, 67 S.Ct. at 1152). Without "persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained," we are not to hold a

state law preempted. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). MMS has not given us "persuasive reasons" to abandon this "basic assumption"; it has not shown "unmistakably" that Congress intended to create a *right* to balance bill. Its evidence shows, with at least equal force, an intent simply to leave existing fee-setting practices undisturbed. And, this latter intention is perfectly consistent with later decisions by individual states to regulate balance billing on their own.

If one rereads the language and history of the Medicare Act, including the portions quoted above, one finds them (at most) ambiguous as to whether Congress meant merely to leave the practice of balance billing undisturbed or meant as well to create a balance billing right that the states could not alter. It is true, as MMS argues, that the statute speaks of an "itemized bill" that might in fact be a "balance bill." But the Act nowhere includes the word "right" or any other language suggesting creation of a right immune from state interference. Nor does such language appear in the legislative history. The legislative remarks to which MMS points show that the doctors' organizations that opposed the Medicare Act won a legislative victory by stopping a *federal* ban on balance billing. But, they do not show, nor does any history of the Act that we have found suggest, that these doctors' organizations won, in addition, a federal prohibition against *state* regulation of their fees. *See, e.g.,* T. Marmor, The Politics of Medicare (1973); R. Myers, Medicare (1970); R. Stevens, Statutory History of the United States: Income Security (1970). We think that such a victory against state regulation, if won, would have seemed significant and unusual enough to have warranted mention. Nor do we see that Congress's rejection of a balance billing ban in 1984 shows more than that Congress again chose not to impose a *federal* ban. We have found no language in the debates surrounding the defeated bill that shows a congressional intent to protect the practice of balance billing from state regulation. In

any case, we would be reluctant to use the history of a later, unsuccessful amendment as evidence of what Congress intended in drafting an earlier act. But, even if we take *at face value* all the evidence that MMS has presented, it still does not unmistakably show a congressional intent to create the kind of indefeasible right with respect to which the Massachusetts law might seem to be an "obstacle."

### B

MMS makes a second set of arguments, which bear upon the underlying *purpose* of the Medicare Act. MMS says that the basic purpose of the Act—to insure adequate medical care for the elderly—implies that Congress *must* have meant to give doctors the "option" to balance bill. MMS argues in general that without the freedom to bill more than the reasonable charge, some doctors might refuse to treat Medicare patients because they would consider the government's "reasonable" charge to be unreasonably low. MMS does not dispute that price protection of the sort afforded by the Massachusetts statute might in fact make medical care affordable for more old people. But, it says, in creating the dual payment "option," Congress "struck a deliberate balance between the goals of affordability and access." And, it says, Congress struck this balance uniformly for every state; it did not intend the preemptive power of the "option" to vary from "state to state depending upon varying attitudes and economic circumstances."

MMS argues more specifically that even if Congress did not *as a general matter* mean to forbid states from altering this "balance," the Massachusetts statute *in particular* will frustrate Congress's objective to assure maximum access to medical care. At trial, it offered testimony designed to show that the Massachusetts ban on balance billing would cause doctors to stop treating Medicare patients or to leave the state altogether. For this reason, too, says MMS, the Massachusetts law is an obstacle to accomplishment of the Medicare Act's basic purposes.

Insofar as MMS's arguments rest on specific language in the congressional debates, they are inadequate for the reasons set out in Part A. Insofar as they rest on logic or theory about what Congress "must have" wanted, they are equally unconvincing. To decide whether the potential harm of a balance billing ban outweighs its potential good is obviously difficult, and the answer may vary from state to state. MMS provides no convincing theoretical or logical reason why Congress would not, or could not, have wanted to leave such a decision to the states. After all, a state is ordinarily as concerned as the federal government to see that its elderly citizens enjoy medical care. A state would not normally wish to impose a ban that would hurt those citizens more than it helped them. Indeed, a state would likely be *more* cautious than the federal government, thinking twice before imposing such a ban, for a single state's ban on balance billing risks losing doctors to other states, while a federal ban does not. Moreover, to the extent that relevant economic conditions vary from state to state, an individual state may better be able to strike the balance between "affordability" and "access" in a way that best serves its older citizens.

We have found nothing in the legislative history that contradicts this view that Congress understood the difficulty of applying a uniform rule to every state. In fact (assuming for the sake of argument that later history is relevant), Congress seemed particularly sensitive to state-to-state variations when it rejected a nationwide ban on balance billing in 1984. Several Representatives argued that such a ban could reduce access to medical services in rural regions in particular. *See* 130 Cong.Rec. H2851 (daily ed. Apr. 12, 1984) (statement of Rep. Jones) ("I am particularly concerned over the potential damaging effect of [the proposed balance billing ban] in rural areas, especially in the States of the South and West where there are fewer providers."); *accord id.* at H2799, H2857 (statement of Rep. Stenholm); *id.* at H2824 (statement of Rep. Roberts); *id.* at H2831 (statement of Rep. Hall); *id.* at H2832 (statement of Rep. Fuqua); *id.* at H2853 (statement of Rep.

Rowland); *id.* at H2857 (statement of Rep. Jenkins); *id.* at H2859 (statement of Rep. Flippo). Of course, every state has some rural areas. Nonetheless, this perception that the virtues of a balance billing ban vary from region to region seems to cut against MMS's general claim that Congress meant to deny each state the freedom to deal with the matter as it sees fit.

We are similarly unconvinced by MMS's efforts to prove factually in the district court that the Massachusetts balance billing ban will create an "obstacle" to providing needy patients with access to care. By putting various factual assumptions to experts, counsel elicited testimony that the ban could cause as many as ten to twenty percent of the Massachusetts doctors who formerly treated Medicare patients to stop doing so. (A. 500–03, 518, 928–30, 972.) Yet, it is undisputed that 99 percent of all Massachusetts doctors participate in Blue Shield, which has had such a ban since the mid–1960s (A. 121, 805); that Massachusetts doctors (prior to the new ban) chose the "assignment" method on 90 percent of all Medicare claims, accounting for 94 percent of all Medicare charges (A. 460, 504, 808); and that 71 percent of all Medicare patients are already protected by balance billing bans imposed under other insurance programs (A. 464–65, 511–12). It is also undisputed that Massachusetts, with doctors' incomes among the nation's lowest (A. 888), leads the states in doctors per capita (A. 514–15, 851, 888–89, 1065). These facts make it difficult for us to say that the behavior of Massachusetts doctors is so sensitive to the level of their fees and that the new ban will so severely cut those fees that a large number of doctors would stop serving the elderly or even leave the state. Thus, like the district court, we cannot say that MMS has proved that the ban will hurt Massachusetts Medicare patients more than it will help them.

C

Since neither the language nor history of the Medicare Act nor practical arguments resting on its basic purposes convince us that Congress intended to create a strong

balance billing *right,* the "option elimination" cases that MMS cites, *see supra* p. 792, do not provide it with adequate legal support. In each of these cases, the Supreme Court found that Congress had created or guaranteed a strong *right,* a right to be immune from state interference. *See Lawrence County v. Lead-Deadwood School District,* 469 U.S. at 270, 105 S.Ct. at 703 (holding that in drafting the Payment in Lieu of Taxes Act, "Congress was sufficiently clear in its intention" to distribute funds to local governments to be spent "without substantial interference" by state law); *Michigan Canners & Freezers Association v. Agricultural Marketing & Bargaining Board,* 467 U.S. at 465, 104 S.Ct. at 2520 (noting that the Agricultural Fair Practices Act protects a producer's " 'right to ... refrain from joining ... an association of producers' " (quoting 7 U.S.C. § 2303(a))); *Fidelity Federal Savings & Loan Association v. de la Cuesta,* 458 U.S. at 158, 102 S.Ct. at 3025 (noting that the Federal Home Loan Bank Board had specified that due-on-sale practices shall be " 'governed exclusively by Federal law' " and that " 'Federal associations shall not be bound by or subject to any conflicting State law which imposes different ... due-on-sale requirements' " (quoting 41 Fed.Reg. 18286–87 (1976))); *Ridgway v. Ridgway,* 454 U.S. at 59–60, 102 S.Ct. at 57 (holding that "[f]ederal law and federal regulations bestow upon the service member an absolute right to designate [a life insurance] policy beneficiary"); *McCarty v. McCarty,* 453 U.S. at 224, 101 S.Ct. at 2737 (noting that the Railroad Retirement Act says that a member of the Army " 'is entitled to retired pay' " (quoting 10 U.S.C. § 3929) and that a Senate report called retired pay a " 'personal entitlement' " (quoting S.Rep. No. 1480, 90th Cong., 2d Sess., 6 (1968), U.S.Code Cong. & Admin.News 1968, p. 865); *Hisquierdo v. Hisquierdo,* 439 U.S. at 584, 99 S.Ct. at 809 (noting that the Railroad Retirement Act specifies that its benefits shall accrue " 'notwithstanding any other law ... of any State' " (quoting 45 U.S.C. § 231m)); *Free v. Bland,* 369 U.S. at 667, 82 S.Ct. at 1092 (noting that the relevant federal regulation provides that " '[n]o judicial determination will ... defeat or impair the rights of survivorship conferred by these regulations' " (quoting 31 C.F.R. § 315.20)); *Franklin National Bank v. New York,* 347 U.S. at 377, 74 S.Ct. at 553 (reading the Federal Reserve Act to confer "the right of a national bank" to act as a savings bank); *Wissner v. Wissner,* 338 U.S. at 658, 70 S.Ct. at 399 (noting that the National Life Insurance Act states that servicemen " 'shall have the right to designate' " life insurance beneficiaries (quoting 38 U.S.C. § 802(g))); *Hill v. Florida,* 325 U.S. at 543, 65 S.Ct. at 1375 (noting that the National Labor Relations Act insures "free exercise of the ... right to collective bargaining"); *First Federal Savings & Loan Association v. Greenwald,* 591 F.2d at 425 (noting that the relevant federal regulation specifies that the obligations it imposes shall be exclusive of all others).

In each of these cases, there was evidence that Congress intended to create an affirmative right, protected from state regulation. We have found no evidence that Congress intended to create a *right* to balance bill. MMS has not convincingly shown that Congress chose more than to leave preexisting billing practices undisturbed. Under the appropriate legal standard, *see Maryland v. Louisiana,* 451 U.S. at 746, 101 S.Ct. at 2128 (noting presumption against preemption); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. at 142, 83 S.Ct. at 1217 (holding there must be "persuasive reasons" to preempt state law), therefore, we must conclude that the Massachusetts balance billing ban does not pose a significant "obstacle," constitutionally speaking, to any congressional "purpose" or "objective" in the Medicare Act.

## II

■ MMS also argues that the Massachusetts ban on balance billing violates the due process clause of the fourteenth amendment because it deprives doctors of

the "liberty" to practice their profession. The Massachusetts statute makes a doctor's promise not to balance bill a condition of obtaining a license. *See supra* pp. 790–91. Moreover, the Massachusetts Board of Registration in Medicine has stated that it will impose sanctions for any violation of the law "that are commensurate with the severity of the violation" (A. 1052)—sanctions that may include a reprimand, censure, fine, or suspension or *revocation of license. See* Mass.Gen.Laws ch. 112, § 5; Mass.Regs.Code tit. 243, § 1.05(5). MMS notes that in *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), the Supreme Court held unconstitutional a state's denial of admission to the bar on the basis of the applicant's past use of aliases, record of arrests, and prior membership in the Communist Party. The Court said that a

> State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but *any qualification must have a rational connection with the applicant's fitness or capacity to practice* law. Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church.

*Id.* at 239, 77 S.Ct. at 756 (emphasis added). MMS argues that the condition that Massachusetts imposes on medical licenses—a promise not to balance bill—is not rationally connected with a doctor's "fitness or capacity to practice" medicine.

In our view, however, this "promise" simply amounts to a rule. It is a rule that forbids balance billing. And, there is nothing irrational about a state's saying that a doctor, entering the profession, must promise to follow the rules. Nor is it irrational to say that a doctor who *seriously* violates the rule—who commits a violation that is "commensurate with" the penalty of license revocation—is not "fit" to practice medicine.

For these reasons, the judgment of the district court is *Affirmed.*