680 F.Supp. 455 (1988)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
COMMONWEALTH OF MASSACHUSETTS, the Trial Court of the Commonwealth of Massachusetts, and the Massachusetts Retirement Board, Defendants.
Civ. A. No. 87-3015-K.
United States District Court, D. Massachusetts.
February 23, 1988.
*456 Cheryl Kramer, James Lee, EEOC, New York City, for plaintiff.
H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., for defendants.

OPINION
KEETON, District Judge.
Between November 3 and November 30, 1987, several Massachusetts state court judges filed charges of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Letter of Violation and, after conciliation failed, filed a complaint against the Commonwealth and others in this court on December 18, 1987. The EEOC charges that the provision of the Massachusetts Constitution requiring that justices of the Trial Court of Massachusetts retire upon attaining the age of 70 is a violation of the Age Discrimination in Employment Act of 1967 ("ADEA" or "the Act").
At a conference on January 28, 1988, a joint motion for a phased trial pursuant to Fed.R.Civ.P. 42(b) was granted. Phase I of the trial was limited to the issue of preemption. The res judicata effects of Apkin v. Treasurer and Receiver General, 401 Mass. 427, 517 N.E.2d 141 (1987) (holding that the ADEA did not preempt the state law of mandatory retirement as to the plaintiff in that case), issues concerning damages and relief, and any other issues that might in any circumstances be essential to final disposition were deferred to Phase II.
Phase I proceeded immediately on January 28. At trial, plaintiff and defendants rested after submission of trial briefs (Docket Nos. 11, 12), a Statement of Agreed Facts (Docket No. 15), and a Legislative Research Council Report Relative to Judicial Selection in the United States (Docket No. 14). This Opinion resolves against plaintiff the issue presented in Phase I. In view of this ruling, all issues reserved for Phase II are moot, and final judgment for defendants will be entered forthwith.

I.
As provided in the state constitution, judges in the Commonwealth of Massachusetts have always been chosen by appointment of the governor, with advice and consent of the Governor's Council. Constitution of the Commonwealth, Part II, c. 2, § 1, art. 9. In 1972, the judicial tenure provision of the Massachusetts Constitution, Part II, Chapter 3, art. 1, was amended by Amend. Art. XCVIII to provide that "upon attaining seventy years of age said *457 judges shall be retired." Since the effective date of this 1972 amendment, judges in the Commonwealth of Massachusetts have been mandatorily retired at age 70.
Subject to several exceptions explored more fully infra, the ADEA, 29 U.S.C. § 621, et seq., prohibits an employer from discriminating in hiring or firing against an employee who has reached the age of 40. The mandatory judicial retirement provision of the Massachusetts Constitution was unaffected by the ADEA when the Constitution was amended in 1972 because, at that time, the ADEA did not apply to State and municipal employers or to employees 65 years or older. In 1974, however, Congress amended the definition of "employer" to include a State and any political subdivision. See 29 U.S.C. § 630(b). In 1978, the age limit of 65 was raised to 70, and in 1986 (effective January 1, 1987), Congress eliminated the age 70 limit by amending the ADEA to cover all employees having reached the age of 40. See 29 U.S.C. § 631(a).
It is undisputed that if the definition of "employee" extends to the judges on whose behalf EEOC sues, the enforcement of the mandatory retirement provision of the Massachusetts Constitution is a prima facie violation of the Act. See Equal Employment Opportunity Commission v. Trabucco, 791 F.2d 1 (1st Cir.1986).
Under the Supremacy Clause of the United States Constitution, a conflict between federal law and state law must be resolved in favor of the federal law. Thus, if and "to the extent that the [ADEA] conflict[s] with existing mandatory retirement statutes, the Supremacy Clause dictates that federal law prevail." Orzel v. City of Wauwatosa Fire Dept., 697 F.2d 743, 752 (7th Cir.1983); see also Louisiana Public Service Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 1901, 90 L.Ed.2d 369 (1986) (stating that the supremacy of federal law is a "basic underpinning of our federal system").

II.
The central issue in this case is the meaning of an "except" clause in the ADEA definition of "employee."
The term "employee" means an individual employed by any employer except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.
29 U.S.C. § 630(f) (emphasis added).
Close examination of this statutory definition reveals the following features of its method of expressing its meaning.
(1) No single test of inclusion or exclusion from the definition is stated; rather, a general statement defining a test for inclusion is followed by an "except" clause that takes out of the definition (of "employee") some of the persons who are within the group identified by the general inclusionary test.
(2) Within the "except" clause, no single test for exception is stated; that is, the "except" clause does not state a single identifying characteristic or a single set of characteristics that a person must have to be excepted from the definition of employee. (This point is explained more fully in Part III, infra.)
(3) None of the several different characteristics referred to in the "except" clause (each of which is, at least in some circumstances, relevant to determining whether a person is excepted) is alone a necessary precondition to being excepted from the definition of "employee." Instead, the "except" clause states that a person having any one of several different characteristics is excepted from the definition of "employee."
Though not the only way a drafter may choose to disclose the meaning of an instrumentwhether it is a statute, a contract, a will, a declaration of trust, or any other kind of instrument  this method of drafting is quite common.
*458 One who is charged with responsibility for determining and applying the meaning of a definition drafted by this method must, to be candid and realistic in the search for manifested meaning, take account of the following additional features of definitions drafted in this form:
(4) Each of the several different characteristics identified in an "except" clause as sufficient alone to take a person out of a definition (here, the definition of "employee") is likely to be based upon a concern or combination of concerns about overbreadth of the inclusionary test (which the "except" clause qualifies), and that concern or set of concerns is likely to differ from the concern or set of concerns about overbreadth on which each of the other listed characteristics is based.
(5) Nevertheless, the whole universe of instances to which the definition is to be applied is finally divided into only two groups  those persons within and those persons not within the definition (here, the definition of "employee").
(6) This classification of all persons into one of two contrasting groups is done, implicitly if not explicitly, on the premise that all those in the "excepted" group are similar in some way that is relevant to the determination of the legal rights and responsibilities that the statute (or other document) governs.
(7) Because of inherent limitations of human imagination and foresight, any listing of characteristics of different categories of persons who are nevertheless alike for some purpose of decisionmaking is almost certain to be incomplete.
Illustrations of this seventh point are legion. An example that will serve to clarify the point is a traffic rule declaring a speed limit or some other "rule of the road." Customarilyperhaps even invariablythe rule is subject to exceptions for emergencies. The ordinance or statute may so state, as some have, leaving it to courts to develop the catalog of circumstances that constitute "emergencies" in this context. Or the ordinance or statute may, as some have, use the method of an "except" clause to list such specific instances as operation of ambulances and police and fire vehicles responding to calls of distress. Experience has demonstrated that when this latter method of drafting the "except" clause is used, courts are confronted with cases involving factual circumstances that present claims to recognition as emergencies that are at least as compelling as those explicitly listed.
A statute requiring lights on a buggy proceeding upon a highway later than one hour after sundown was before the court in Martin v. Herzog, 228 N.Y. 164, 126 N.E. 814 (1920). In his opinion for the court, Judge Cardozo wrote that an "unexcused omission of the statutory signals" would constitute negligence per se. Id., 126 N.E. at 815. Suppose that, by way of excuse, one charged with violating this statute offered evidence that out of the gloom someone threw rocks that destroyed the lights and left the traveler stranded to wait until dawn or proceed in literal violation of the prescribed standard of conduct. The clear implication of Cardozo's phrase, "unexcused omission of the statutory signals," is that some excuses not specified in the statute would be recognized. Should a court uphold a misdemeanor conviction under this statute against a person who proceeded cautiously, but without the required lights, to a haven safe from the risk of harm by the unknown rock-thrower(s), or should it hold that proceeding in such circumstances was an "excused omission of the statutory signals"? This is a question a court must answer because it was not answered in the statute. Attributing to the legislature a negative answer by engaging in a "literal" interpretation of the statute  which stated a general rule and stated no exception to it, or stated some exceptions but none explicitly applicable to these facts  is contrary to the position most courts have taken when confronted with such an instance of incompleteness. By well established tradition and practice, courts have, instead, engaged in a more discriminating and more realistic effort to determine the manifested meaning of the statute, taken as a whole, and read in context.
*459 The standard of statutory interpretation is one of manifested meaning, or, as it is more often phrased, manifested intent. I emphasize "manifested" to underscore the point that this is an objective standard of judgment, not a "subjective" or "state of mind" standard.
It is nevertheless customary for courts and counsel, in cases involving disputes over meaning of statutes, to express arguments and rulings in terms and phrases that use "intent." For example, it is common practice among courts and counsel to refer to the search for meaning of a statute as a search for "Congressional intent" or "legislative intent." In Thompson v. Thompson, ___ U.S. ___, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988), all of the Justices subscribed to the principle that the issue of whether an implied cause of action is present in a particular statute is determined by reference to Congress' "intent." See id. (majority opinion of Marshall, J., and concurring opinion of Scalia, J., in which O'Connor, J., joined). To one unfamiliar with this venerable tradition of Anglo-American law, which is observed not only in relation to construing statutes but also in relation to construing contracts, the "intent of Congress" or the "intent of the parties" to a contract might appear to refer to a state of mind of some person or entity, or to the states of mind of two or more persons. A closer examination of the law regarding interpretation of statutes and contracts, however, discloses that the legal standard of interpretation applied is an objective standard of manifested intent or manifested meaning, rather than a subjective, state-of-mind standard. Indeed, that "intent of Congress" as used in precedents does not refer to a state of mind is apparent when one takes account of the fact that no legal entity other than a natural person ever has a state of mind in a factual sense.
It is equally clear that "intent of Congress" does not refer to a standard under which the states of mind of individual Members of Congress would be vicariously attributed to Congress as an entity. If states of mind of individuals were truly the standard, it would be anomalous for courts in determining that intent to do so solely from other evidence and without hearing the testimony of the persons whose states of mind were at issue.
For these reasons, it is apparent that a phrase such as "Congressional intent" or "intent of Congress" refers not to a state-of-mind standard but to an objective standard of interpretation that might also be described as the intent, aim, or design manifested in the statute itself (or in the statute together with legislative history when, under precedents, it is appropriate to look to legislative history). This is the standard employed in this Opinion.
Applying this objective standard to determine the meaning of a statutory definition such as that of "employee" in 29 U.S.C. § 630(f), one faces this central issue: Can one be faithful to the manifested meaning of the statute by assuming (or presuming) that the list of instances in the "except" clause is exhaustive  that no other instance may be recognized? Or is it more faithful to the manifested meaning of the statute to examine at least the "context" in the literal sense of the text of the entire statute of which this definition is a part, and perhaps the context in the broader sense of the circumstances that caused the legislation to be enacted, to determine whether the sense of all the listed exceptions together, in context, is that the listed exceptions are prescriptive and directive but not necessarily exhaustive?
The Supreme Court of the United States, state courts of last resort, and other federal and state courts have often concluded that it is error to interpret as exhaustive a list of independently sufficient tests of exclusion from a definition. A familiar form of statement of this conclusion is that statutes often have "lacunae," "gaps," or "interstices." Cf. Shearson/American Express v. McMahon, ___ U.S. ___, 107 S.Ct. 2332, 2359, 96 L.Ed.2d 185 (1987) (Stevens, J., concurring) (stating that "[g]aps in the law must, of course, be filled by judicial construction"); Mailhot v. Travelers Ins. Co., 375 Mass. 342, 377 N.E.2d 681, 682 (1978) (stating that "there are likely to be casual overstatements and understatements, *460 half-answers, and gaps in the statutory provisions" of any large legislative enterprise and that the courts are called on "to interweave the statute with decisions answering the difficulties and composing ... an harmonious structure faithful to the basic designs and purposes of the legislature"). Unless those elements of incompleteness of prescription are so severe as to make the statute subject to challenge for vagueness, courts do, and indeed must, determine answers to the unanswered questions of implementation of the manifested meaning of the statute because they must rule, in each case before them, that some person or persons are within the group to whom the statutory definition applies, or that they are not.

III.
It is argued in this case that because the Commonwealth of Massachusetts is an "employer," see 29 U.S.C. § 630(b), and because judges in Massachusetts are not "elected to public office," the text of the ADEA literally declares that Massachusetts judges are "employees" for purposes of the Act.
Of course, it is not argued that the statute literally says, "Judges who are not elected to public office are `employees' for the purpose of this Act." Rather, the argument is that appointed state judges fall within the inclusionary test for "employee" and are not "literally" covered by any exclusionary test. Even if one is forbidden to look to context, however, the "literal" interpretation of the Act remains ambiguous because of at least two unstated premises. The first such premise is that the list of different characteristics in the "except" clause, each of which is alone sufficient to take a person outside the definition, is an exhaustive list (never to be extended by a court even to circumstances that appear equally or more compelling than listed circumstances for an exception consistent with the manifested objectives of the Act). The second such premise is that Massachusetts judges, in fact, do not have any of the several different characteristics that are listed as each sufficient to take a person outside the definition of "employee." A closer reading of the statutory definition discloses compelling reasons for doubting the validity of each of these two unstated premises.
I set forth the text of the statute again, but with some separations into subdivisions and insertions of numbers in brackets that may be an aid to identifying the separately listed characteristics each of which is alone sufficient to take a person outside the definition of "employee."
The term "employee" means an individual employed by any employer except that the term "employee" shall not include
[1] any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or
[2] any person chosen by such officer to be on such officer's personal staff, or
[3] an appointee on the policymaking level[,] or
[4] an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.
29 U.S.C. § 630(f) (subdivisions and numerals added for emphasis).
It is readily apparent that all four of the subcategories are potentially applicable to persons in one "branch" (executive) of every state government, that at least three (all but the third) are potentially applicable to persons in the second branch (legislative), but that, under the interpretation proposed by the plaintiff, none of the four subcategories would apply to any employee in the third branch (judicial) in those states in which judges are appointed. This striking contrast raises at least a concern about potential issues of constitutionality because of the very loose "fit" between objectives of the Act (described immediately below) and the form of remedy prescribed. Cf. Nollan v. California Coastal Comm., ___ U.S. ___, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). That concern should cause one to pause and reconsider any impulse to accept uncritically the suggestion that plaintiff's interpretation is even "literally" valid, much less that it is valid when "context" is considered, in either the narrower sense or *461 both the narrower and broader senses referred to above.
At least two manifest purposes of the ADEA are readily discernible. First, the Act is aimed at protecting employees against age-based discrimination. Second, other compelling public and private interests that come into conflict with this worthy goal are to be accommodated rather than overridden. What is the manifested intent as to identification of those other interests and how shall they be accommodated?
One of the conflicting interests respected by the Act is that of qualified voters not only to choose their public officers but also to choose (directly by voting for a state constitutional provision or indirectly by the action of their legislative representatives) that even those whom they have elected shall not serve in office beyond a designated age. The underlying concerns manifested by adoption of this exception emphatically do not include a congressional interest in taking sides on the currently active controversies within many states about whether judges shall be elected or appointed. Yet, plaintiff's proposed reading of the statute would introduce into the political dispute on this controversial issue of state government a federally-imposed factor significantly weighing against a choice by the state electorate to have state judges appointed. Is it a reasonable interpretation of this definition of "employee" that the Act was designed to accomplish this rather significant intrusion into state political choices? Quite apart from other concerns addressed below, an affirmative answer hardly seems defensible. If it is not, then an argument for interpretation of the Act in this way is a proposal for departing from implicitly manifested meaning  an argument that, to serve some unarticulated interest in "literal" interpretation, the Act should be given an effect apparently inconsistent with its manifested objectives of accommodating compelling interests in the freedom of qualified voters of the states to make choices of their own as to how the highest officers in the third branch are to be selected (by election or by appointment), how long they shall serve, and to what age.
A second conflicting interest for which the Act manifests respect is an interest in allowing what might be called higher-level government officials to have free rein in making appointments to certain kinds of staff and other official positions  including freedom from constraints against age-based discrimination. This interest is legitimate not solely from the perspective of self-interest of the appointing officials but also from the perspective of the public interest in the qualities of the persons selected to such appointive positions. Cf. Apkin v. Treasurer and Receiver General, 401 Mass. 427, 436, 517 N.E.2d 141 (1987) (noting that mandatory retirement of appointed judges "tends to assure that important decisions affecting citizens ... will be made by judges who command respect because they share experiences ... similar to that of the majority" and also "makes it possible to increase the proportion of minority group members and women in the judiciary"). The interest referred to in this paragraph and, to the extent this interest tends to support them, the second, third, and fourth of the separately listed characteristics (within the "except" clause of the definition of "employee") are not closely aligned with or coextensive in reach with the interest of qualified voters in their freedom of choice among candidates for elective public office, their choice regarding the method of selection (election or appointment), and their choice regarding age as a factor in the period of their service. Elected officials (the first category) include some at relatively low levels of authority; the appointive officials who are within the second, third, and fourth categories tend to be themselves, or be close advisers to, officials at a relatively high level of authority.
Closely related to but nevertheless distinct from the second conflicting interest is a third, the consideration of which may shed additional light on what it is that the first category shares in common with the others. This third interest is explicitly referred to by the description of the third category as including persons "on the policymaking level" and the fourth category as including "immediate adviser[s] with respect *462 to the exercise of the constitutional or legal powers of the office." "Policymaking" is more often used to describe an aspect of the functions of high-level executive and legislative officers than an aspect of judging. It is nevertheless clear that "policymaking" is indisputably a part of the function of judging to the extent that judging involves lawmaking to fill the interstices of authority found in constitutions, statutes, and precedents (a function more predominant in appellate judging than in the performance of trial judges, who are of course, the group whose interests plaintiff EEOC seeks to protect in this litigation). Moreover, the substantive interest identified by the phrase "on the policymaking level" is closely aligned with an interest referred to by phrases such as "exercise of discretion" and "exercise of judgment," which are indisputably descriptive of most of the performance of those persons within the judicial branch who serve as judges (including trial judges).
I do not suggest that a purely "literal" interpretation of "an appointee on the policymaking level" must necessarily include judges. I do conclude, however, that it would be error to say that the only reasonable "literal" interpretation is one that excludes judges. Further, I conclude that when context is taken into account, the argument for an interpretation that appointed judges are "appointees on the policymaking level" becomes even more cogent.
If an interpretation of the "except" clause as applying to no appointed judges were adopted, the resulting line between those who are and those who are not "employees" would be not merely a somewhat wavering line because of the different characteristics and different sets of interests identified by the four different categories in the "except" clause but, more strikingly, a line jumping sharply up or down as to levels of authority and levels of discretionary performance, depending on whether one served in an elective office (in which case even lower tier officers would be excepted, in all three branches of government) or an appointive office (in which case persons serving in discretionary or advisory positions would be covered in the judicial branch and excepted in the other two branches). I conclude that such a sharply irregular line of division between "employees" excepted and those included for ADEA purposes is incompatible with the manifested objectives and manifested meaning of the text of the Act as a whole.
This conclusion is reached without reliance on precedents imposing a "clear statement" prerequisite to preemption of state law  as to which, see Part V, infra. Invoking the "clear statement" requirement could only strengthen this conclusion.

IV.
The conclusion reached in Part III, if sustained against challenge, is dispositive of the case because the argument for ADEA preemption of the state constitutional provision for retirement of judges at age 70 depends in the first instance on a declaration of that preemption, express or implied, in the ADEA.
There is a "strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, ___ U.S. ___, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). "As is true in every case involving the construction of a statute, our starting point must be the language employed by Congress." Reiter v. Sonotone Corp., 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979).
Part III, above, explains the conclusion that this first step supports the position argued by defendants in this case  that Massachusetts judges, though appointed rather than elected, are excepted from the definition of "employee" in the ADEA.
Because the issue of interpretation addressed in Part III is close and debatable, however, it is appropriate to consider whether an examination of legislative history shows any cause for questioning this conclusion.
Neither in the submissions of the parties nor in the court's examination of legislative history has anything been found that is an aid to interpreting the statute in relation to *463 the present controversy. The legislative history is of no help on this point because the "history behind the 1974 amendment [which extended the ADEA to state employers] is less than abundant, as this was included in a much broader package of amendments to the Fair Labor Standards Act...." Ramirez v. Puerto Rico Fire Service, 715 F.2d 694, 698-99 (1st Cir.1983). There is no reference to state judges, either elected or appointed, in the legislative history relating either to the 1974 amendment (extending the Act to State employers and employees) or to the 1986 amendment (extending the Act to all employees of the age of 40 or above).
The reference closest to an expression about judges and judging is the following statement accompanying the 1986 amendment of the Act, which lifted the age 70 ceiling:
Age alone has nothing to do with an employee's ability to work. Justice Oliver Wendell Holmes served with distinction in the Supreme Court into his 90s. Congressman Claude Pepper, the father of Age Discrimination Law in this country, is still going strong at age 86....
S.Rep. 16853, 99th Cong., 2d Sess. (1986). These references are to distinguished federal judicial and legislative service, and they were not made in connection with the language at issue in this case. It would be difficult to draw from them an inference favorable to excepting state legislative officers and elective state judicial officers, as ADEA admittedly does, and preserving only for state appointed judges the protected status that this passage might be thought to support for all judicial and legislative officers of state as well as federal government. There is no "fit" between this bit of legislative history and the use for which plaintiff seeks to invoke it.

V.
Parts III and IV of this Opinion address the meaning of the ADEA, in relation to the issue presented in this case, by application of the standard of manifested meaning, or, as it is often stated, manifested intent.
Because some of the arguments advanced in this case have been cast in a form one might reasonably understand as arguing for application of some form of state-of-mind standard of statutory interpretation, I proceed, in the alternative, to consider whether arguments construed in that sense are supportable in fact in the present case.
Should this court determine that in fact Congress, or a majority of the Members of Congress (and perhaps as well, that the President, who signed the bill), consciously thought about the impact of ADEA on appointed stated judges and formed the state of mind of intent that they not be excepted from the definition of "employee" in the ADEA? Should this court determine that in fact one or all of these persons or entities consciously formed an intent that ADEA preempt state constitutional or statutory provisions for retirement of state judges (whether appointed or elected) at age 70? Several subsidiary points are relevant to answering these questions.
First, who bears the risk of nonpersuasion on these state-of-mind fact questions? Doubts may exist about the precise meaning of the established requirement of a "clear statement" of "Congressional intent" to preempt state law. See, e.g., Atascadero State Hospital v. Scanlon, 473 U.S. 234, 239-40, 105 S.Ct. 3142, 3146, 87 L.Ed. 2d 171 (1985); Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539-40, 67 L.Ed.2d 694 (1981); New York Dept. of Social Services v. Dublino, 413 U.S. 405, 413, 93 S.Ct. 2507, 2512-13, 37 L.Ed.2d 688 (1973); United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971); L. Tribe, American Constitutional Law § 6-26, at 480 (2d ed. 1988). It is beyond doubt, however, that if other precedents are to be interpreted as applying a state-of-mind standard in the present context, then the precedents requiring a "clear statement" must mean at the least that the burden of proof is upon the party claiming preemption  in this case, the plaintiff.
Second, if precedents are to be interpreted as applying a state-of-mind standard to *464 the issue of "Congressional intent," is the issue as to whether the relevant state of mind (intent to apply ADEA to state appointed judges) existed at the time of enactment an adjudicative fact question or instead a nonadjudicative fact question? See Fed.R.Evid. 201 and Advisory Committee notes; see also In re Asbestos Litigation, 829 F.2d 1233, 1245, 1247-51 (3d Cir.1987) (Becker, J., concurring). For reasons stated in Massachusetts Medical Society v. Dukakis, 637 F.Supp. 684 (D.Mass.), aff'd, 815 F.2d 790 (1st Cir.1986), cert. denied, ___ U.S. ___, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), and authorities therein cited, I conclude that a decision on this question of "Congressional intent" will be precedent, that higher courts will not apply the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) to this court's determination of the issue, and, in short, that the issue is one of nonadjudicative fact. Thus, any court considering the issue is free to look beyond the "evidence" offered at trial in relation to adjudicative fact questions (in this case, solely a stipulation of facts submitted by the parties at the trial of Phase I). Having considered all evidence of record and all extra-record materials submitted by the parties, I determine (a term I use in preference to "find" to underscore the point that the issue as presented in this context is a nonadjudicative fact question) that the plaintiff has failed to show the alleged "intent" of Congress or any of its Members in enacting the bill that appointed state judges be subject to the ADEA.
If, in the alternative, this issue is to be treated as one of adjudicative fact, it is even clearer that plaintiff has failed to meet the burden of proving such an "intent." Only the evidence of record  the stipulated facts  could be considered in relation to an adjudicative fact issue, and the stipulated facts do not support a reasoned inference or finding that there existed a state of mind of consciously thinking about the effect of the definition of "employee" on appointed state judges and consciously forming the intent that they be covered.
It may be argued that it is most unlikely that Congress, or individual Members of Congress coming from all the states, would have overlooked or failed to think about the fact that in a significant minority of states all or some judges are appointed. I credit that factual argument. It does not follow, however, that those who adverted to this fact also formed an intent that the ADEA cover appointed state judges even though explicitly excepting from coverage elected state judges. It is far more likely, in fact, that they either (1) formed no intent either way on this precise issue (thus leaving a "gap" or an instance of incompleteness of prescription, by reason of which courts must determine an answer to the question that is consistent with the manifested objectives of the statute), or (2) formed an intent that all state judges be excepted and thought that intent had been sufficiently manifested in the terms of the statute as enacted, or (3) formed an intent to leave this issue to the courts, to be resolved according to the manifested objectives of the statute and in the context of the existing body of law, including precedents with respect to the "clear statement" requirement. It matters not which of these three inferences is drawn; each requires a ruling that the ADEA does not preempt the Massachusetts constitutional provision for mandatory retirement of judges at age 70.
Thus, whether one looks solely to the evidence of record at trial (the stipulated facts) or instead more broadly to everything in the legislative history and elsewhere that might aid one in making a reasoned determination of this issue, by far the most realistic inference is that even if some Members of Congress did advert to the fact that the Act was saying something about the third branch, they did not form the intent that elected state judges be excepted from the Act and appointed state judges be covered. It is simply not a credible inference that at least a majority of the Members of Congress, voting on this matter, would have formed this intent, and acted upon it, without one word of comment about it in the legislative history. For that to have happened, the issue would have had to be either noncontroversial or inconsequential. It was, in fact, neither.
*465 For all these reasons, I conclude that even if precedents should be interpreted as presenting an issue of a state of mind of "intent" to preempt state law as to mandatory retirement of appointed state judges, no such intent existed. Plaintiff has failed to meet its burden on this contention, if indeed such a contention for application of a state-of-mind standard was meant to be advanced.

VI.
Part V considers plaintiff's arguments as to "intent of Congress" as if they were meant to urge the court to apply a subjective state-of-mind standard. In this Part, these arguments are reexamined, treating them, as they were more likely meant, as urging the court to apply an objective standard of manifestations, but objective manifestations about the state of mind of at least a majority of those Members of Congress who voted on the enactment of the amendment to the statute in issue.
It may be an implicit (and valid) premise of the standard of manifested intent of Congress that, like the objective standard of manifested intent of the parties in contract law, this standard is aimed at being at least as effective as a subjective standard would be in achieving legal outcomes consistent with the states of mind that existed in fact. That is, given all the difficulties of administering a standard that would put in issue the states of mind of Members of Congress and make their present testimony in court relevant to determining the historical fact of their states of mind at the time of voting on enactment, as a practical matter an objective standard that bases decisions on objective manifestations of record and declares all other evidence irrelevant is a better rule. The aim, nevertheless, is to reach decisions that, far more likely than not, will be consistent with those a state-of-mind standard would have produced, but at far greater social, political, and administrative cost.
From the perspective of maintaining consistency with this aim, it may be useful to subject any tentative conclusion about manifested intent of Congress to some "as if" tests of realism. One such test is to view the tentative conclusion as if it were a determination of states of mind, and ask whether from that perspective it seems realistic. Consider, for example, the proposed conclusion that it was the state of mind of a sufficient number of Members of Congress to constitute a majority of the vote for enactment that elected state judges be excepted from ADEA but that appointed state judges be covered. For exactly the same reasons as are stated in Part V above (considering the outcome of applying a true state-of-mind standard), the argument that Congress manifested such an intent as this fails the "as if" test of realism. The proposed conclusion that this many Members of Congress formed this state of mind and nevertheless not one of them said one word about it for the record of legislative history is not even plausible, much less persuasive.
A second form of "as if" test of realism is also instructive. Under this test, courts would view the issue as if they were determining the states of mind of Members of Congress as to whether they consciously adverted to the fact that as drafted the Act applied to at least some persons in the third branch as well as the executive and legislative branches of state governments and, if so, whether they also consciously adverted to and meant to answer the question as to whether appointed state judges should be excepted. If, viewing the matter, a court determines that it is most likely that most Members of Congress voting for enactment either did not form a state of mind about how the Act would deal with appointed state judges or else formed a state of mind of leaving that question unanswered, then the realistic answer to the issue of manifested intent is that Congress has left a question to be answered elsewhere than in Congress. A candid explanation of how the question is answered is that courts must and do fashion answers to such statutorily unanswered questions. A court's attributing its answer to some manifestation of intent by Congress would be a form of legal fiction. A less than benign aspect of the fiction is that it tends to discourage reasoned explanation of the basis for the *466 answer. More constructive and useful is the candid recognition that the answer is fashioned by courts, and that the courts have an obligation of disclosure of the reasoned basis for the answer. Implicit in this obligation is the point that courts are not free of all constraints in fashioning an answer. Rather, they must and do seek and respect all the guidance available in the objectives manifested in the explicit statutory mandates, construed in context in the largest sense, or manifested in the legislative history (to the extent precedents support use of that source of guidance).
The insights provided by these "as if" tests of the realism of a proposed determination of manifested "intent of Congress," applied in the present case, reinforce the conclusions expressed in Parts II-IV of this Opinion (1) that Congress did not manifest an intent that appointed state judges be covered by this Act, and (2) that the answer more consistent and compatible with the explicit mandates in the "except" clause and with the objectives of the Act as a whole is that appointed state judges in the group on whose behalf plaintiff sues as well as elected state judges are excepted from coverage of the Act.

VII.
Because nothing appears in legislative history to cast doubt on the conclusion reached in Part III, the interpretation of the statute developed in Part III is appropriate for application in this case. The state judges on behalf of whose interests EEOC sues in this case are excepted from the definition of "employee" in the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(f), as amended effective January 1, 1987. All other issues presented by the submissions of the parties are moot.
Judgment will be entered for defendants.