YORK HOSPITAL, et al.,[1] Plaintiffs,

v.

MAINE HEALTH CARE FINANCE COMMISSION, et al., Defendants.

Civ. No. 86–0140–P.

United States District Court,
D. Maine.

July 13, 1989.

1. The Court has restyled this case to reflect changes within the plaintiffs' ranks. As is discussed *infra,* the Court has granted a separate trial of all claims to two of the original nine plaintiffs. York Hospital and Mount Desert Island Hospital are now before the Court for adjudication, on a stipulated record, of their claims relating to five counts of the complaint. Bath Memorial Hospital, the plaintiff originally named in the style of this case, is not one of the two plaintiffs whose claims are now before the Court, and the Court has changed the style of this case accordingly.

Joseph M. Kozak, Jay H. Krall, Pierce, Atwood, Augusta, Me., for plaintiffs.

Lucinda E. White, Gordon E. Stein, Health Care Finance Com'n, Augusta, Me., John P. Doyle, Jr., Preti, Flaherty, Portland, Me., William F. Julavits, Maine Hosp. Ass'n, Augusta, Me., Leigh I. Saufley, Sr. Asst. Atty. Gen., Christopher Beach, Asst. Atty. Gen., Dept. of Human Serv., Augusta, Me., for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

### I. INTRODUCTION

On April 7, 1986, nine hospitals located within the State of Maine[2] filed a complaint in this Court challenging the validity of the Maine Health Care Finance Act, 22

---

**2.** The nine hospitals are: (1) Bath Memorial Hospital, Bath; (2) Blue Hill Memorial Hospital, Blue Hill; (3) Franklin Memorial Hospital, Farmington; (4) Henrietta D. Goodall Hospital, Sanford; (5) Mercy Hospital, Portland; (6) Mount Desert Island Hospital, Bar Harbor; (7) St. Joseph Hospital, Bangor; (8) Waldo County General Hospital, Belfast; and (9) York Hospital, York.

M.R.S.A. sections 381–400 (Supp.1985) (the "Maine Act" or "Act"), on constitutional and statutory grounds. Defendants are the Maine Health Care Finance Commission (the "Commission"), a state executive agency established pursuant to 5 M.R.S.A. section 12004, subsection 4, and its six members and officers.[3] The Maine Department of Human Services, which administers the Medicare program in Maine, was permitted to intervene. Pursuant to the Act, Defendant Commission sets annual limits on the revenue each hospital may collect from its patients for patient care and hospital overhead. Plaintiffs claim that, by including amounts received by the hospitals as Medicare reimbursement in calculating the hospitals' annual revenue limits, the Act violates both the United States Constitution and the Maine Constitution.

On February 12, 1987, on Plaintiffs' motion, United States Magistrate D. Brock Hornby granted a separate trial of all claims to Plaintiffs York Hospital and Mount Desert Island Hospital, preserving the right to trial of all claims to the remaining Plaintiff hospitals.[4] Plaintiffs York Hospital and Mount Desert Island Hospital filed a motion for partial summary judgment on May 11, 1987. On that date, Defendants also filed a motion for summary judgment.

On November 9, 1987, this Court issued a Decision and Order determining that it had subject matter jurisdiction over Plaintiffs' Medicare claims, but abstaining from adjudication of the issues generated in Plaintiffs' complaint, and granting, without prejudice, Defendant Commission's motion to dismiss. *Bath Memorial Hospital, et al.*

*v. Maine Health Care Finance Comm'n, et al.*, 673 F.Supp. 628 (D.Me.1987). Seven of the nine Plaintiff hospitals appealed.[5] The Court of Appeals for the First Circuit reversed this Court's decision to abstain, and remanded the case for further proceedings.[6] *Bath Memorial Hospital, et al. v. Maine Health Care Finance Comm'n, et al.*, 853 F.2d 1007 (1st Cir.1988).

On remand, the Court entered, with the consent of counsel, a Procedural Order dated October 27, 1988, ordering the parties to stipulate a record for consideration of Plaintiff's Medicare claims, Counts I through IV, as well as Plaintiff's claim concerning legal costs, Count IX. Plaintiffs York Hospital and Mount Desert Island Hospital and Defendants have so stipulated and have briefed these issues fully.

## II. BACKGROUND

### A. *The Statute*

In 1983, the Maine Legislature, in response to the rapid rise in health care costs, established the Defendant Commission to administer a new hospital cost containment system that prospectively limits what hospitals can charge its patients for health care services. The Commission sets the limits on what each hospital may charge, based on the expected total revenue requirements of the institution. The Commission sets the limits using a three-step formula.

In step one, the Commission determines the amount of money a hospital needs to cover all of its costs in a given base year. Act §§ 396–A, 396–B. These costs include, for example, patient care, debt service, an-

---

**3.** The six members and officers are: David F. Wihry, Chairman; Agnes E. Flaherty, Diantha Carrigan, Paul G. Poulin and Peter M. Leslie, members; and Francis G. McGinty, Executive Director.

**4.** Counsel apparently made oral representations to the Magistrate, as he has to this Court, that counsel would pursue the positions of York Hospital and Mount Desert Island Hospital on the merits as "representative plaintiffs," implying that the result obtained at trial on these claims would be treated as dispositive also of the same claims of the other Plaintiffs. This

appears to conflict with the express language of Magistrate Hornby's Order of February 12, 1987. The Court cannot find any formalization in the record of these representations.

**5.** Neither Bath Memorial Hospital nor Waldo County General Hospital joined in the appeal.

**6.** The Court of Appeals also dismissed Defendants' cross-appeal concerning the issue of subject matter jurisdiction. The Court of Appeals held that this Court's decision concerning standing and jurisdiction was not a final order subject to appellate review. 853 F.2d at 1016.

ticipated capital improvements, and actual financial outlays. This base year figure is adjusted, taking into account a statutorily provided list of variables,[7] to determine the hospital's "payment year financial requirement," the total financial requirement set for the hospital in the given year. Act §§ 396–C, 396–D.

In step two, having determined the hospital's anticipated financial needs, the Commission ascertains and totals the hospital's non-patient sources of income. The Commission calculates the total of government grants, earmarked gifts, and interest the hospital receives on accumulated income. Act § 396–E. The statute refers to this figure as "available resources."

In step three, the Commission figures the "gross patient service revenue limit" ("GPSRL"), which is the amount of revenue the hospital may collect from patients and *non-Medicare* third-party payors.[8] Act § 396–H. The Commission first subtracts "available resources" from the total financial requirements determined in the first step. The resulting figure is the amount that the hospital must find elsewhere to meet its projected financial obligations. In setting GPSRL, the Commission takes into account the level of Medicare revenues a hospital can expect to receive in the forthcoming year.[9] Thus, an expected increase in Medicare revenues correspondingly reduces GPSRL.[10]

At this third step, the Commission does not consider whether Medicare payments yield a net "profit" or "loss" after costs of treating Medicare-covered patients. The Commission factors in these anticipated Medicare revenues without considering the corresponding costs, because such costs of care to Medicare patients has already been taken into account at step one of this process. When it has determined GPSRL for that payment year, the Commission divides GPSRL among all *non-Medicare* major third-party payors,[11] such as Blue Cross/Blue Shield and Medicaid, each of which is a separate category, and all other purchasers and payors other than major third-party payors, which together constitutes one category. Allowable income is allocated to each category approximately according to its use of the hospital's resources.

The intended net result of the Commission's formulaic approach to financing the State's hospitals is relatively simple. The Commission seeks to set income allowances that will permit each hospital revenues sufficient to match the calculated necessary expenditures. After evaluating the hospital's total financial need, examining available resources such as gifts and grants, and estimating revenue from Medicare (a source over which the Commission has no control), the Commission calculates the rev-

---

**7.** These variables include: inflation; case mix of patient admissions; maintenance and replacement of facilities and equipment; volume of services; productivity and efficiency; working capital; change in services provided by the hospital; and other adjustments including management and information systems, unforeseen costs beyond the hospital's control, new regulatory costs, and other specified costs.

**8.** Section 396–H defines GPSRL as the sum of:
   A. The payment year financial requirements of the hospital, offset by the hospital's available resources in accordance with section 396–E; and
   B. The revenue deductions determined pursuant to section 396–F.

**9.** The Commission also estimates the discounts available to certain third-party payors, as well as allowances for bad debt and charity care, that further reduce the net amount the hospital

receives for patient services. Act §§ 396–F, 396–G.

**10.** The reason that Medicare receipts are considered separately is that, unlike charges to non-Medicare patients and third-party payors, the Commission has no control over the amount of revenue each hospital receives through Medicare. Thus, Medicare receipts are treated as a fixed source of revenue, the anticipated amount of which will directly affect the hospital's revenue requirements from other, non fixed sources to make up the balance of anticipated costs.

**11.** The Act defines a major third-party payor as one who is
   A. responsible for payment to the hospital of amounts equal to or greater than 10% of all payments to the hospital, as this amount is determined by the commission; and
   B. maintains a participating agreement with the hospital. Act, § 382, subsection 9.

enue gap, and sets the hospital's rates to third-party payors and users accordingly.[12]

### B. *Plaintiff's Legal Argument*

Four of the five counts now before the Court for decision concern the Commission's treatment of Medicare revenues in the formula described above. Counts II and III of Plaintiffs' complaint claim violation of the supremacy clause contained in article VI of the United States Constitution. Count I claims a deprivation of property without just compensation in violation of the Maine Constitution as well as the Fifth and Fourteenth Amendments of the United States Constitution, while Count IV claims impairment of obligations of contract, in violation of Article 1, Section 10 of the Constitution. Because these claims center around the relationship between the Act and Medicare payments made to the Plaintiff hospitals, a brief comparison of the relevant features of the two systems is in order.

The Medicare program was created as an insurance program for certain aged individuals to receive health benefits, including hospital services at any hospital choosing to participate. *See* 42 U.S.C. § 1395, *et seq.* Prior to 1983, Medicare reimbursed participating hospitals for inpatient hospital care retrospectively. On October 1, 1983, the Medicare Prospective Payment System ("PPS") went into effect. Rather than setting Medicare reimbursement retrospectively, PPS is designed to reimburse hospitals based on rates determined prospectively. When a patient is admitted to a hospital, the patient's diagnosis upon admission is categorized as one of 470 "diagnosis-related groups," or DRG's. Medicare pays the hospital a predetermined, uniform rate for that patient's care, according to the DRG assigned upon the patient's admission.

The significance of the PPS system for present purposes is that if the hospital can perform the service at an actual cost lower than the reimbursement rate paid by Medicare under PPS, the hospital may retain the difference. Conversely, if the actual cost to the hospital exceeds the amount reimbursed by Medicare, the hospital must find another source of revenue to absorb the "loss." 42 U.S.C. § 1395ww(d). PPS-participating hospitals are entitled to receive payment for Medicare-covered services according to the DRG assigned to the initial diagnosis. Whether the payment the hospital receives for the service provided to the Medicare patient under this program results in a profit, or loss, is determined entirely by the hospital's economic efficiency in delivering the Medicare service. In this manner, PPS creates an incentive for hospitals administering care under the Medicare program to operate more efficiently. S.Rep. No. 23, 98th Cong., 1st Sess. 47, *reprinted in* 1983 U.S.Code Cong. & Admin.News, 143, 187. The purpose of this system of prospectively determining fees for specific services is to better control overall costs in the Medicare system. The system makes no promise or guarantee to hospitals that they will earn a profit or sustain a loss in providing Medicare services; rather, Medicare provides a fixed fee for a fixed service. Because the hospital has no refund obligation with respect to the amount paid for a Medicare service under the DRG schedule, it is in the individual hospital's economic interests to provide the service in the most efficient manner possible.

Both the Medicare system and Maine's system, overseen by the Commission under the Act, provide an economic incentive to the hospitals. A hospital has an incentive under the Medicare system to keep its costs for Medicare services below the amount paid according to the DRG, since the hospital need not return any part of the reimbursement payment to the federal government. Similarly, the prospective budgets set by the Commission for a particular hospital provide an economic incentive to keep costs down, because the hospitals may not raise their charges to patients and third-party payors to generate reve-

---

**12.** No issue is made concerning the accuracy of the Commission's estimates of Medicare reve- nues for the base year.

nues which exceed the revenue limits in an effort to make up for budgetary shortfalls. Under Maine's system, the Commission has authority to determine how much the hospital charges users and third-party payors, but it has no control over the amount of Medicare revenue each hospital receives for Medicare-covered treatment.

This incentive approach common to both the Medicare system, resulting from an effort to hold down Medicare reimbursement expenditures, and to the Maine system, resulting from an effort to regulate overall hospital charges to patients and third-party payors, is at the root of Plaintiff's complaint. Plaintiffs argue that Maine's statutory system conflicts with the incentive objective of Medicare's PPS system. In setting the rates a hospital may charge, the Commission reduces the amount of revenue the hospital is allowed to collect from non-Medicare sources by the amount of Medicare reimbursement the hospital can expect to receive in the given payment year. Plaintiffs claim that, because Medicare reimbursements are factored into the determination of GPSRL, Maine has destroyed the cost-saving incentive provided by the Medicare reimbursement system. In other words, because any "profit" a hospital "earns" on the Medicare PPS system is factored in to reduce the amount other third-party payors and patients will have to pay, Plaintiffs argue that the incentive to keep Medicare-covered treatment costs down is compromised. Counts I through IV of Plaintiffs' complaint, addressed by the Court here, claim that the Maine Act unconstitutionally affects the implementation of the federal Medicare statute.

The other count of Plaintiffs' complaint currently before the Court is Count IX, in which Plaintiffs claim that the Act operates to deprive them of the opportunity to obtain full legal representation. Pursuant to section 397 of the Act, the Commission has promulgated rules of practice that regulate Plaintiffs' right to appeal proposed GPSRL decisions of the Commission. According to Plaintiffs, the rules do not permit the Commission to adjust the individual Plaintiffs' financial obligations to reflect actual costs in mounting such an appeal. Plaintiffs claim that the Defendants' control over Plaintiffs' ability to engage in the regulatory process unfairly denies Plaintiffs the right to counsel, constituting a denial of due process rights under the Fourteenth Amendment of the United States Constitution.

## III. LEGAL ANALYSIS

### A. *Supremacy Clause*

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land...." U.S. Const. art. VI. Under this clause of the United States Constitution, the Supreme Court has consistently held that federal law may preempt state legislation. *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986); *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

The Supreme Court has recognized at least three circumstances under which federal law may supercede state legislation. Federal law supercedes state law where Congress, in enacting a federal statute, expresses a clear intent to preempt state law. *Jones v. Rath Packing Co.*, 430 U.S. at 525, 97 S.Ct. at 1309. Where there is a pervasive federal scheme that leaves no room for the states to supplement it, the Supreme Court has considered this an implied preemption of state action in the field occupied by the federal law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, even where preemption is neither express nor implied in the federal statute, a state law is invalid which actually impedes achievement of the purposes and objectives of Congress in enacting a valid federal statute. *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Plaintiffs' constitutional claims under the supremacy clause encompass all three cir-

cumstances. In Count III of the complaint, Plaintiffs claim that the provision in the Medicare statute that permits states to obtain a waiver of the federal system in favor of a state-designed system constitutes an express preemption of state involvement in regulating federal Medicare payments. 42 U.S.C. § 1395ww(c). In Count II of the complaint, Plaintiffs claim that the Medicare statute contains an implied preemption of state regulation of Medicare payments, or, in the alternative, that the Commission's calculations under the Act impermissibly interfere with the Congressional objectives which underlie the Medicare statute.

### 1. Express Preemption

■ In Count III of the complaint, Plaintiff claims that the waiver provision of the Medicare statute constitutes an express preemption of the field of regulating Medicare payments. The Medicare waiver provision states in pertinent part:

> [T]he Secretary [of the Department of Health and Human Services] may provide, in his discretion, that *payment with respect to services provided by a hospital* in a State may be made in accordance with a hospital reimbursement control system in a State, rather than in accordance with the other provisions of this title....

42 U.S.C. § 1395ww(c) (emphasis added). Plaintiff points out that, without obtaining such a waiver, the Commission does not have the authority to regulate *the amount of Medicare payments the federal government is required to make to Plaintiffs.* Plaintiff then argues that the Commission, in calculating the hospitals' gross revenue requirements, exercises regulatory control over the Medicare payments made to the hospitals in violation of the express preemption of such activity established in the Medicare waiver provision.

The Court does not agree that the Medicare waiver provision expressly preempts the Commission's consideration of Medicare payments in calculating the hospitals' gross revenue requirements. The Medicare waiver provision invites the states to submit alternative plans to govern the manner in which Medicare reimbursement is made. The Commission's calculations, however, do not, and cannot, regulate the payment of Medicare benefits. The Commission simply takes into account the amount of revenue that the federal government will pay the hospitals in Medicare reimbursement benefits under the DRG system, and does not regulate the Medicare payments themselves.[13] Therefore, even accepting, without deciding, that the Medicare waiver provision expressly preempts the states from regulating Medicare payments, the waiver provision does not prevent the Commission's consideration of the Medicare payments in its calculation of the hospitals' gross revenue needs because it has no effect whatsoever on the Medicare payments themselves.

The Court concludes that the Commission's use of a hospital's Medicare payments as a factor in calculating, under the state system, the hospital's anticipated gross revenue needs does not constitute regulation of the Medicare payments, and, accordingly, is not affected by the waiver provision in 28 U.S.C. section 1395ww(c).

### 2. Implied Preemption

As discussed *supra*, the Medicare Act and PPS regulations control the amount that hospitals are reimbursed for services rendered to Medicare-covered patients. Under PPS, hospitals receive a fixed amount for the service rendered, according to the DRG assigned upon the patient's admission to the hospital. This system controls the amount of money the federal government must pay out in Medicare

---

**13.** As the parties themselves stipulated to the Court:

> Medicare is the only payor whose obligations for payment to Maine hospitals are not defined and prescribed by the Commission. Instead, the *Maine payment system* has been developed under rules and regulations which

require that the development of a hospital's revenue limit be Medicare neutral, in the sense that it *does not purport to affect the amounts paid to hospitals by Medicare.*

Stipulated Record, ¶¶ 41B(1), 41B(2) (emphasis supplied).

costs, and the desire to "earn profit" and/or avoid losses from the Medicare payment received provides an incentive to hold down hospital costs.

Congress's intent to preempt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation in the field. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230, 67 S.Ct. at 1152. Plaintiffs claim that the Medicare program is so pervasive as to compel the "reasonable inference" that Congress, in enacting the Medicare program, left no room for the State of Maine (absent an explicit waiver) to supplement the program. *See Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). According to Plaintiffs' argument, the Commission has entered into this preempted field by regulating the amount of Medicare payments actually realized by Maine hospitals.

■ Plaintiffs have not argued, nor could they argue, that Congress intended to preempt the entire hospital cost containment field. As a threshold matter, there is a presumption of validity concerning state or local control of health and safety matters. *Hillsborough County v. Automated Medical Laboratories,* 471 U.S. at 715, 105 S.Ct. at 2376. The Court of Appeals for the First Circuit has recognized specifically that regulation and containment of hospital costs are within the purview of state authority. *Massachusetts Nurses Ass'n v. Dukakis,* 726 F.2d 41, 44 (1st Cir.1984). In *Massachusetts Medical Society v. Dukakis,* 815 F.2d 790 (1st Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), the Court of Appeals considered whether a Massachusetts statute that prohibited doctors from charging Medicare patients more than the DRG amount was preempted by the Medicare statute. Citing its opinion in *Massachusetts Nurses Association v. Dukakis,* the Court noted that plaintiffs could not argue implicit preemption of the entire field of medical fee regulation, because this is a field that "seems by tradition to be one of state concern." *Id.* at 791. Where such a tradition of state regulation exists, courts must presume that Congress has not preempted state power to act unless that is Congress's "clear and manifest purpose." *Id.* at 792, *citing Rice v. Santa Fe Elevator Corp.* 331 U.S. at 230, 67 S.Ct. at 1152.

■ Nor does the Court accept Plaintiffs' argument that the Act encroaches upon the narrow field of Medicare reimbursement regulation. Even accepting Plaintiffs' argument that the Medicare statute has, by implication, preempted state regulation of the Medicare payment system absent an express waiver, the Court nonetheless finds no intrusion into the federal government's control of Medicare payments to Maine's hospitals pursuant to the Medicare statute. Contrary to Plaintiffs' argument that the Commission regulates the amount of the Medicare payments each hospital may realize, Maine's statute does not, in any way, control the amount of revenue each hospital may collect through Medicare.

The Commission has not attempted to, nor can it, determine the amount of Medicare reimbursements. The Commission's process for determining GPSRL takes Medicare revenues into account before setting the amount of revenue each hospital may collect from patients and third-party payors because the Commission has no control over the amount of Medicare revenue each hospital will collect. In creating PPS, Congress has simply established uniform rates for specified Medicare services, with an eye toward cutting the cost of the Medicare program to the federal government. Each hospital's Medicare revenue depends entirely upon the DRGs assigned to each patient upon admission, and the Commission has no control over this determination. Accordingly, even accepting *arguendo* Plaintiffs' argument that Congress has, by implication, preempted the field of regulating Medicare payments to participating hospitals, the court finds that Maine's Act does not encroach upon this presumed area of federal preemption.

### 3. Preemption Due to Frustration of Congressional Policy

■ Absent a finding of intrusion into an area of express or implied federal preemption, courts may still determine that federal law preempts a state statute or regulation to the extent that compliance with both state and federal law is a "physical impossibility," *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where state law may interfere with "execution of the full purposes and objectives of Congress." *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. at 204, 103 S.Ct. at 1722. Plaintiffs here urge that Maine's Act impermissibly conflicts with the federal government's purposes and objectives embodied in the Medicare Act.

It is Plaintiffs' contention that the Commission's use of anticipated Medicare revenues in its calculations of each hospital's revenue needs from other, third-party sources frustrates Congressional intent. Plaintiffs argue that the Commission's calculations remove the incentive for each hospital to minimize its costs for Medicare-covered treatment, and that there is no longer an incentive to treat a Medicare patient for less than the amount prescribed by the DRG assigned upon entrance to the hospital. Plaintiffs argue that, beyond mere entitlement to payment according to the DRG of the administered treatment, the hospital is entitled to a *profit* on that service if the hospital is able to deliver the care for less than the amount of reimbursement authorized by the DRG.

According to Plaintiffs' argument, the Congressional purpose in creating PPS is to guarantee hospitals an overall "profit" or "loss" equivalent to the amount of "profit" or "loss" attributable to the difference between Medicare revenues and costs. Plaintiffs argue that, by removing the prospect of profit, and the spectre of loss, the Commission fundamentally and completely frustrates the Congressional purpose behind PPS. If the hospital does treat the patient for less than the DRG revenue it receives, the Commission, in effect, applies this "profit" to reduce the amount other parties must pay for treatment at the hospital. If the Medicare-covered treatment costs more than the corresponding DRG provides, then the hospital knows that the Commission will simply cover the "loss" with funds from elsewhere in the hospital's operations, or by increasing costs to third-party payors. Thus, Plaintiffs urge that denying the hospital the full incentive provided by Medicare profits or losses impermissibly frustrates Congressional purpose.

Plaintiffs' argument blurs the critical distinction to be made between the purpose of the Medicare statute, and the mechanism Congress chose to effect this purpose. At the heart of Plaintiffs' argument is a fundamentally erroneous assertion concerning Congress's actual purpose in creating PPS. The purpose behind creating a system of paying for Medicare services prospectively is not, as Plaintiffs urge, to provide to hospitals a profit. As discussed *supra,* under the system in place prior to PPS, the federal government absorbed all "reasonable costs" incurred in treatment of Medicare-covered patients. 42 U.S.C. §§ 1395e, 1395f(b), 1395ww(b). Congress, recognizing that this system provided little opportunity for the federal government to control its Medicare costs, created PPS as a way to restrain these costs.

> This bill is intended to improve the [M]edicare program's ability to act as a prudent purchaser of services, and to provide predictability regarding payment amounts for both the Government and hospitals. More important, it is intended to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost/effective hospital practices.

H.R.Rep. No. 25, 98th Cong., 1st Sess. 132, *reprinted in* 1983 U.S.Code Cong. & Admin.News 219, 351. To achieve this purpose of improving the Medicare program's ability to purchase services productively, to increase predictability, and to promote efficiency, PPS provides concrete financial incentives for participating hospitals to cut their costs, rather than simply passing on

increased costs to the federal government as had been the case under the prior Medicare payment system.

The *purpose* behind Congress's creation of PPS, then, is to control the cost of the Medicare program *to the federal government. Griffin Hosp. v. Comm'n on Hosp. and Health Care,* 200 Conn. 489, 512 A.2d 199, 203, *appeal dismissed,* 479 U.S. 1023, 107 S.Ct. 781, 93 L.Ed.2d 819 (1986). The *mechanism chosen* to effect this purpose, PPS, is one which may result in a "profit" to an efficiently run facility, or in a "loss" to a less efficient one. The federal government's interest is in restraining its Medicare costs primarily, and in restraining the costs of medical care generally. The federal government has no direct interest in whether or not a particular hospital incurs a "profit" or "loss" in its Medicare treatment. Congress has merely created a reimbursement system in which the profit motive may operate to lower the actual cost of Medicare-provided services. *See Griffin Hosp. v. Comm'n on Hosp. and Health Care,* 512 A.2d at 203–04.

Accordingly, the Court does not agree with Plaintiffs' contention that the Commission's calculations impermissibly frustrate Congressional intent. PPS achieves Congress's purpose of holding down its Medicare costs by fixing the amount of reimbursement hospitals may receive for particular DRGs. The prospect of "profit" or "loss" is merely a corollary of PPS. *Id.* at 203. The Court cannot accept the notion that Congress intended by the statute to grant to hospitals *the right to a profit* from treating Medicare patients, and that any prospect of profit is immune from the impact of state regulatory schemes.

Nor does the Court agree that the Commission's inclusion of total Medicare *revenues* in its calculations extinguishes the hospital's *profit* incentive. The Commission's calculations do not affect either the amount of Medicare-covered care the hospital may administer, or the amount of revenue the hospital may generate in the form of Medicare reimbursement. The hospitals still have an incentive to avoid Medicare costs in excess of corresponding Medicare revenues, because the hospitals must make up for such losses elsewhere in their operations, and in such respect, are subject to regulation under the state scheme to the extent that the effort to do so has impact upon revenues from patients and third-party payors. The Commission, having prospectively determined the rates charged third-party payors, will not change these rates after the fact in order to compensate for losses in Medicare-covered treatment not foreseen at the time GPSRL was established. If a hospital is able to administer care at less than the amount considered by the Commission in establishing GPSRL, the hospital need not return the difference. The Commission will not retroactively reduce the rates charged to third parties to reflect the increased efficiency. This, clearly, provides an incentive to manage the hospital's operations more efficiently.

In sum, if losses in administering Medicare-covered treatment causes a hospital's overall costs to exceed overall revenues under the budget established by the Commission, the hospital must cover this overall loss through some other operating or non operating income. Conversely, if the hospital's efficiency allows it to realize overall revenues in excess of its costs, the Maine Act permits the hospitals to retain the amount of such savings in its entirety. Stipulated Record, ¶ 45. This profit or loss incentive under the state Act parallels that under Medicare's PPS, with the exception that the Medicare incentive is limited to Medicare treatment, whereas Maine's Act provides an incentive to cut costs overall. The Court finds no frustration of Congressional purpose in Maine's plan, which expands the scope of each hospital's cost-cutting incentive to encompass its entire operation, while at the same time leaving intact the federal government's goal of limiting Medicare outlays to DRG-prescribed levels.

The Court concludes that the Commission's calculations under the Maine Act do not impermissibly frustrate Congressional purpose as embodied in the PPS system under the Medicare Act. Having determined that the Commission's calculations neither run afoul of any express or implied preemption of state action in regulating

Medicare payments nor impermissibly frustrate any specific federal legislative purposes, the Court concludes that the Maine Act is not in violation of the supremacy clause contained in article VI of the United States Constitution.

### B. *Deprivation of Property without Just Compensation*

Plaintiffs claim that the Commission's factoring of expected Medicare revenues into the determination of the amounts all other third-party payors may be charged for hospital care constitutes a deprivation of property without just compensation. Count I alleges a violation of the takings clause contained in the Fifth Amendment of the United States Constitution, as well as the takings clause contained in Article 1, Section 21 of the Maine Constitution.[14] The Court addresses in turn the federal and state constitutional taking claims.

### 1. *Federal Constitutional Taking*

a. Plaintiffs have no property interest in "profit" from Medicare

■ As Plaintiffs have correctly pointed out, intangible forms of property may constitute the subject of an unconstitutional taking. Where a governmental regulation impairs a property interest, a taking may occur regardless of whether the form of the property interest is tangible or intangible. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002–03, 104 S.Ct. 2862, 2872–73, 81 L.Ed.2d 815 (1984). The United States Supreme Court has found a property interest sufficient for Fifth Amendment "taking clause" purposes in trade secrets, *id.* at 1003–04, 104 S.Ct. at 2873, materialmen's liens, *Armstrong v. United States*, 364 U.S. 40, 44, 46, 80 S.Ct. 1563, 1566, 1567, 4 L.Ed.2d 1554 (1960), real estate liens,

*Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 596–602, 55 S.Ct. 854, 866–869, 79 L.Ed. 1593 (1935), and valid contracts, *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). Clearly, then, the intangible nature of the profits Plaintiffs claim are taken by the Commission's calculations is no barrier to a Fifth Amendment taking claim.[15]

It is not, however, the intangible nature of Medicare profits, but rather Plaintiffs' characterization of such profits as "property," that presents the more serious issue. For the same reasons as those expressed in this opinion *supra*, addressing Plaintiffs' preemption claim, the Court finds no entitlement on the part of Plaintiffs to "profits" from its administration of care under the Medicare Act. Absent legal entitlement to specific profits, there can be no property interest, and thus, no taking.

When a Medicare-participating hospital administers care to a patient covered by the program, the hospital is reimbursed for the care according to the DRG assigned upon the patient's admission to the hospital. The Medicare Act, in effect, guarantees the participating hospital the DRG reimbursement, and the hospital has a right to receive this payment. Arguably, this right to payment could be characterized as a property right, and regulatory interference with this payment may very well be subject to scrutiny under the Fifth Amendment Taking Clause. That issue is not here presented, however, because the state scheme in no way interferes with the receipt of payments as prescribed by the DRG.

In the instant case, Plaintiffs allege a taking of their right to realize a net profit from their participation in the Medicare

---

**14.** The takings clause found in the Fifth Amendment of the United States Constitution provides, in pertinent part, that "nor shall private property be taken for public use, without just compensation." The Constitution of the State of Maine, Article 1, Section 21 provides that "private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it."

**15.** The United States Supreme Court has noted, however, that a physical invasion of property is

more readily recognizable as a taking than an intangible one. It is well settled that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (citations omitted).

PPS program, and not of their right to the Medicare PPS payment itself. Plaintiffs have argued that the Medicare Act guarantees the hospitals the right to earn a profit if they are able to provide Medicare treatment for less than the payment authorized according to the DRG. The Court rejected this argument *supra* in section III–A–3, finding that the profit incentive provided under PPS is merely a corollary of the method chosen to achieve the Congressional purpose of holding down its Medicare expenditures, and that the Medicare statute confers no property right upon participating hospitals to earn a profit. The Court's reasoning applies equally here. Congress authorized payments to hospitals in exchange for administered Medicare-covered service, but imposed no requirement that such services yield a profit under the DRG schedule of payments and, in fact, imposed no restriction upon the hospital's use or application of the reimbursement proceeds. Plaintiffs failed to show a property interest in a profit from Medicare participation under the statute and regulations. The Court finds no property right exists in such possible profits sufficient to invoke the protection of the respective takings clauses of the federal and Maine Constitutions.

### b. The Supreme Court's "significant factors"

■ Furthermore, even assuming *arguendo* that Plaintiffs possessed a property right in profits from Medicare participation, the facts as stipulated do not describe an unconstitutional taking in violation of the Fifth Amendment. The United States Supreme Court has identified three factors of particular significance to be considered in determining whether a taking has occurred. These factors are (1) the economic impact on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). The Supreme Court identifies these factors to be considered in lieu of a set formula, and indicates that the suggested factors are to be considered in conjunction with factual inquiry into the circumstances of each particular case. *Id.* at 224, 106 S.Ct. at 1025.

### i. Character of the governmental action

The character of the governmental action is a factor that clearly weighs in favor of Defendants. As the Court has discussed *supra*, the nature of the Commission's actions in calculating total hospital revenues in order to set the rates hospitals may charge involves regulation in the health care field, an area that is well within state concern. *See Massachusetts Medical Society v. Dukakis*, 815 F.2d at 791. Hospital cost is an interest that is "deeply rooted in local feeling and responsibility" and is therefore within the scope of state regulation. *Massachusetts Nurses Ass'n v. Dukakis*, 726 F.2d at 44, *citing San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). State or local control of health and safety matters are presumptively valid exercises of state police power. *See Hillsborough County v. Automated Medical Laboratories*, 471 U.S. at 715, 105 S.Ct. at 2376.

It is equally well established that states may employ reasonable restraints and regulations upon constitutionally protected property rights in the legitimate exercise of police power. *Nebbia v. New York*, 291 U.S. 502, 523, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934). The United States Supreme Court has stated that "it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. at 223, 106 S.Ct. at 1025. The Court here views the Commission's actions as a valid exercise of the state's police power to regulate health and safety issues that is not rendered invalid simply because the calculations take into account revenues earned from the administration of care to Medicare-covered patients.

In calculating GPSRL, the Commission neither invades nor appropriates the hospital's Medicare-based revenues. These pay-

ments, made solely in accordance with DRG-imposed levels, are not affected by the Maine Act. These revenues are simply recognized as one of the several forms of income available to the hospital that the Commission cannot control or regulate. When these sources of revenue over which the Commission has no control are totalled, the remaining revenues needed to balance the hospital's budget are apportioned among other, third-party payors.

Plaintiffs' argument is that a taking occurs because the Commission's calculations prevent the hospitals from fully realizing the difference between Medicare revenues and costs of administering Medicare-covered care. If the Commission were not permitted to take Medicare revenues into account in setting GPSRL, the result would be higher hospital rates to non-Medicare patients and other third-party payors.[16] Addressing a federal act that required a withdrawing employer-participant in a multiemployer pension plan to fund its share of the plan obligations incurred during its association with the plan, the Supreme Court stated:

> This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking....

*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. at 225, 106 S.Ct. at 1026. The Commission's actions in factoring both Medicare costs, and Medicare revenues, into each hospital's overall financial picture, in order to establish appropriate rates for non-Medicare-related care in each hospital, represents the sort of adjustment of benefits and burdens of economic life that the United States Supreme Court has upheld as a valid regulation. Recognition of Medicare revenues in determing the level of other revenue needed to operate each hospital represents an adjustment of benefit, in the case of Medicare "profit," or burden, in the case of Medicare "loss." No taking results from Maine's exercise, in this manner of its police power to regulate health care costs generally.

#### ii. Economic impact on the Plaintiffs

The Court's finding that the Commission's actions characterize a fully legitimate exercise of power is, by itself, a sufficiently persuasive factor to convince the Court that there is no taking. Another of the factors suggested by the Supreme Court for guidance lends support for this conclusion. The economic impact of the Commission's calculations upon the Plaintiff hospitals is minimal. As discussed *supra*, the Commission has no control over the Medicare payments made to the hospitals. The Commission simply uses the revenue figures in its calculations of what each hospital may charge for its non-Medicare services. Each hospital is free to retain, donate, or spend the Medicare revenues however each may see fit. The hospital may choose to direct its Medicare revenues away from its operating budget, toward capital improvements, endowment funds, or elsewhere.

Plaintiffs claim that the Commission's calculations have a substantial, adverse impact because the loss of "profits" constitutes a loss of the entire value of a contract to provide hospital services to Medicare-covered patients. The only constraint

---

**16.** It should be noted that Plaintiffs' "taking" argument contemplates only the scenario in which Medicare revenues exceed Medicare-related costs, resulting in, by Plaintiffs' definition, "profit." There are indications, however, that such a situation is the exception, not the rule, and that the payments authorized according to the DRG are often insufficient to cover fully the hospital's costs associated with the Medicare services. While Plaintiffs argue that the hospitals have a property right in Medicare profits that should be isolated from the Commission's budgetary considerations, they fail to address the contrasting situation in which a hospital incurs a loss in its Medicare-related treatment. Following Plaintiffs' logic, both profits *and* losses would be isolated from a hospital's overall budget. Patients and third-party payors would reap no benefit from Medicare "profits," and would bear no burden in the event of Medicare "loss." What Plaintiffs leave unanswered in their argument, however, is how a hospital, prevented from shifting patient and third-party revenues to the Medicare side of the ledger sheet, under the state revenue limitation procedure can otherwise produce revenues to make up for shortfalls in Medicare reimbursement when and if they occur.

imposed upon the hospitals, however, is that they may not increase their charges to non-Medicare patients and other third-party payors in order to offset the hospital's diversion of Medicare revenues away from their operating costs. In order for the Commission to acheive its goals, Plaintiffs' position would require the hospital charge limit to be high enough to both cover the hospital's costs and insure that the hospital realize the full amount of Medicare revenue in excess of Medicare-related costs. Such a result would go far beyond minimizing an economic impact upon the hospital, to the point where the Commission would be forced to insure hospital profit at the expense of its legitimate health care cost-cutting objectives.

### iii. Interference with investor-backed expectations

The final question proposed by the United States Supreme Court in *Connolly* is whether the regulation has interfered with reasonable investment-backed expectations. If shareholders have a reasonable expectation that profits will be earned, a governmental regulation that interferes with that expected profit may constitute a taking. The Court finds that this factor also militates in favor of the Defendants in this case.

Plaintiffs acknowledge that, as non profit entities, they do not have "investors" as the term is applied in cases involving alleged takings from privately held corporations. *See, e.g., Ruckelshaus v. Monsanto,* 467 U.S. at 1005–09, 104 S.Ct. at 2874–76. It is argued, however, without precedential support, that trustees, benefactors, volunteers, and community members who have invested time and money in a hospital are sufficiently analogous to actual investors to warrant the Court's finding an interference with their reasonable expectations. These supporters, according to Plaintiffs, have expectations that the hospital will have the opportunity to earn a profit from their Medicare involvement.

The Court does not agree with this analysis, finding no support for the proposition that volunteers and benefactors "invest" their time and money in a hospital with the reasonable expectation that the hospital will earn a profit. Instead, it would seem that such effort is made for the purpose of providing health care services, a goal that Plaintiffs readily concede is being accomplished.[17]

Plaintiffs have argued that a finding that the hospital volunteers and benefactors do not have investment-backed expectations would lead inevitably to the conclusion that all non profit entities, other entities with-

17. As an illustration of a hospital's purposes and expectations in providing health care, paragraph 53H of the Stipulated Record recites the purposes of the York Hospital Corporation as stated in its by-laws:

1. To operate a general medical and surgical hospital to provide this community and its surrounding towns with hospital facilities, and to encourage qualified physicians and surgeons who settle in the general area to use the facilities of York Hospital.
2. To support educational activities related to the operation of the Hospital which in the opinion of the Board of Trustees may be justified by the Hospital's personnel and available funds.
3. To participate in and to provide leadership for, so far as the circumstances may warrant, any activity designed and carried on to promote the general health of the community area.
4. To provide all of the services of the Hospital whether general or surgical, without reference to race, color, creed, sex or national origin; and no person shall be denied any of

the facilities of the Hospital as aforesaid for any such reasons.
5. To the end that the foregoing purposes may be fully and completely carried out, this Corporation shall have the power to receive, hold, purchase, and possess lands and tenements in fee simple or otherwise and to dispose of and sell the same from time to time, and to receive from any and all persons and corporations, or other organizations disposed to aid in its benevolent purposes gifts, grants and devises of real estate, personal property, cash, securities, subscriptions and bequests to be used for the purposes of erecting and maintaining suitable buildings and of operating a general medical and surgical hospital and related activities within the Town of York; and this Corporation may use any such property for any and all of its general purposes unless limited by the terms of the gift or bequest.

The Court notes that these by-laws nowhere suggest or even contemplate an interest in earning a profit from the administration of health care.

out investors, and individuals would have no recourse against takings. The Court acknowledges that this factor will weigh against most non profit entities, because of the lack of investment-backed expectations. The Court emphasizes, however, that this is but one of three factors identified by the Supreme Court for guidance in this area, and an unfavorable finding for this factor in no way dictates a finding that there has been no taking overall. For example, if Maine attempted to take a hospital parking lot for public purposes without compensation, the lack of "investors" in the hospital would certainly not prevent a finding that a taking would occur. Both the character of the government action and the economic impact of such an effort would more than outweigh the lack of investment-backed expectations with respect to the parking lot.

### 2. Taking Under the Maine Constitution

The parties have also addressed the standard applied by the Maine Supreme Judicial Court in determining an unlawful taking under the Maine Constitution, which considers whether use or enjoyment of property has been seriously impaired, see Brown v. Warchalowski, 471 A.2d 1026, 1029 (Me. 1984), or whether property value has been substantially diminished, see Seven Islands Land Co. v. Maine Land Use Regulation Comm'n, 450 A.2d 475, 482 (Me.1982). Examination reveals that the Court's conclusion above, finding no taking under the United States Constitution, applies with equal force to Plaintiffs' state constitutional taking claim.

■ Under Maine law, a finding that a taking has occurred does not require that a plaintiff actually be removed from his property or deprived of its possession. Serious impairment of an interest in property, or in its use and enjoyment, is sufficient. Foss

v. Maine Turnpike Authority, 309 A.2d 339, 344 (Me.1973). If an action deprives an owner of property, or of "one of its essential attributes, destroys its value, retricts or interrupts its common necessary, or profitable use, hampers the owner in the application of it to the purposes of trade, or imposes conditions · upon the right to hold or use it and thereby seriously impairs its value," then an unconstitutional taking has occurred. State v. Johnson, 265 A.2d 711, 715 (Me.1970), citing 16 Am.Jur.2d Constitutional Law § 367; see Brown v. Warchalowski, 471 A.2d at 1029. Plaintiffs' argument is that the Commission's actions completely, and therefore seriously, impairs their interests in their contracts with the federal government as Medicare providers, in violation of Maine constitutional law.

■ Several flaws in Plaintiffs' argument lead this Court to conclude that no taking has occurred under Maine constitutional law. First, as discussed supra, Plaintiffs have not demonstrated a property interest in the right to earn profits from Medicare contracts.[18] While clearly, Plaintiffs have a right to receive payment for Medicare-covered treatment they have administered, the right to earn a "profit" from such payments is entirely up to the hospital. The Court has found no guarantee of profits in the Medicare Act. Second, related to Plaintiffs' failure to show a property interest is the failure to show a significant interference with the Medicare profits. As addressed supra, in setting the hospital's budget, the Commission merely takes into account that the federal government will pay Medicare reimbursement to the hospitals. The Commission in no way intercepts or intervenes in the payment of these funds, nor does it direct how these Medicare funds must be spent.

Finally, Maine law prescribes another takings standard separate from the "seri-

---

**18.** The Court is aware of no Maine case that expressly follows federal constitutional law concerning whether intangible property may be the subject of a taking. There is, however, no reason for this Court to believe that Maine law would differ from federal law in this respect, in light of the Maine Law Court's observance of federal precedent in this area. See, e.g., Seven

Islands Land Co. v. Maine Land Use Regulation Comm'n, 450 A.2d 475, 482 (Me.1982), citing Agins v. Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), Pruneyard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), and Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

ous impairment" claimed by Plaintiffs. In order to find a taking, the Maine Supreme Judicial Court has required a finding that a substantial diminution in the value of the property has occurred. As long as "beneficial uses of the property remain available to the [plaintiff] despite the restrictive regulation or ordinance," the property is not substantially diminished. *Hall v. Board of Environmental Protection*, 528 A.2d 453, 455 (Me.1987); *see Curtis v. Main*, 482 A.2d 1253, 1258 (Me.1984), *citing Sibley v. Inhabitants of the Town of Wells*, 462 A.2d 27 (Me.1983). As the Law Court has stated:

> "In recent years, the Supreme Court of the United States has required the diminution to be very substantial indeed before a taking will be found [citations omitted]. Since ownership consists of a 'bundle' of property rights, the mere extinguishment of one of those rights does not necessarily amount to a taking without compensation. The question is whether the right in question constitutes a 'fundamental attribute of ownership' such that its extinguishment would render the property substantially useless [citations omitted]."

*Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d at 482. The Court finds no such substantial diminution in the value of the Medicare payments to the Plaintiff hospitals. Absent interference with, confiscation of, or other limitation on the use of Medicare payments to the hospitals, it cannot be said that a taking has occurred. At worst, the Commission's calculations affect one small stick in the hospital's larger bundle of property rights, in that the Maine Act prevents hospitals from raising their charges to third-party payors while they pocket the full difference between Medicare costs and revenues. Even this effect, however, is tenuous, and does not elevate the effect of the Commission's calculations to the level of a "taking" under Maine law.

### C. Impairment of Obligations of Contract

Article 1, Section 10 of the United States Constitution provides, in pertinent part, that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." Plaintiffs claim in Count IV that the Commission's actions, by taking Medicare revenues into account in setting hospital budgets and establishing rates of payment for third-party payors, impairs Plaintiffs' contracts with the federal government for administering Medicare services.

The United States Supreme Court has established a three-pronged analysis for determining whether a state law impermissibly impairs contractual obligations. The test looks at (1) whether the state law operates as a "substantial impairment of a contractual relationship," (2) whether there is a significant and legitimate purpose behind the regulation, and (3) whether the adjustments of rights and responsibilities of the contracting parties is based upon reasonable conditions and is "of a character appropriate to the public purpose justifying [the legislation's] adoption." *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504–06, 107 S.Ct. 1232, 1252–53, 94 L.Ed.2d 472 (1987). In this three-pronged analysis, a finding at the first stage that contractual obligations have been altered only minimally may end the Court's inquiry without looking further at the other two prongs. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727, *reh'g denied*, 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978).

Under the first prong, the Court concludes that the Commission's actions taken under authorization of the Maine Act significantly impair no obligation of contract. The Court finds two bases for this conclusion. First, there is no contractual obligation for Medicare to provide a profit to Plaintiffs. Second, the Commission's calculations do not impair or otherwise interfere with payment of Medicare reimbursement to the Plaintiff hospitals or the hospitals' use of the federal resources.

Plaintiffs acknowledge that there is no explicit guarantee of profits in its agreement with the Department of Health and Human Services ("DHHS"), the federal agency which oversees the Medicare pro-

gram. These provider agreements, which dictate the terms of payment for Medicare services provided, contain no reference to a hospital's right to earn income in excess of its cost of administering Medicare-covered care. Stipulated Record, Exhibits E, J. Plaintiffs argue that the provider agreements incorporate the Medicare statute by reference, and the Medicare statute, in turn, guarantees the right to earn a profit. The Court, however, has held, *supra,* that the Medicare program makes no such guarantee. Because the Medicare Act does not guarantee or require a profit, but only provides for payment for services rendered at specified rates, Plaintiffs' argument that a guaranteed profit incorporated in the provider agreement from the federal statute is without merit.

Nor does the Court find substantial interference with the Plaintiffs' right to receive payment. Assuming, without deciding, that the provider agreement constitutes a contract between DHHS and the hospitals, Plaintiffs are at best "guaranteed" the right to receive payment for Medicare services rendered, in accordance with the assigned DRG. As discussed at considerable length *supra,* the Commission's calculations do not interfere with this right to receive payment. Accordingly, there is no substantial impairment of the federal government's contractual obligation to make Medicare payments. Nor is there substantial impairment of the hospitals' right to receive this payment.

The Court's finding, under the first prong of the Supreme Court's test, that there is no interference with a contractual obligation, is sufficient to conclude that the Act does not violate Article 1, Section 10 of the United States Constitution. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. at 245, 98 S.Ct. at 2723. Plaintiffs' Count IV claim thus fails.

### D. *Denial of Meaningful Access to the Courts*

Count IX of Plaintiffs' complaint claims that the Maine Act, and the regulations promulgated under its authority, deny Plaintiffs meaningful access to the courts, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Plaintiff claims that the Commission's prospective determination of each hospital's budgetary needs has underestimated the amount of funds needed to pursue the administrative and judicial avenues of appeal made available under the Act's authority. Plaintiffs argue that, as a result of inadequate funds allocated to legal matters in each hospital's budget, Plaintiffs face the prospect of having inadequate financial resources to pursue available remedies fully. Because the Commission, under the Act's authority, controls the budget allocated for legal matters, while at the same time limiting overall revenues available to the hospitals, Plaintiffs claim that the Act has denied them meaningful access to the courts.

In their briefing in support of the Count IX claim, Plaintiffs suggest that the Commission's control over the funds available for legal expenditures, and its failure to allocate funds sufficient for the purpose, "chills" Plaintiff's due process rights. Defendants have argued that the Court need not address Plaintiffs' due process claim, because Plaintiffs' reliance on a chilled due process right is without authority in the case law. Defendants claim that the concept of a chilling effect on constitutional rights is limited to cases challenging infringement of First Amendment rights, *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and has not been applied to general due process considerations.

The Court does not agree with Defendants' assessment of the legal posture of Plaintiffs' due process claim. A chilling effect on constitutionally protected rights can be the basis of a due process claim. *See, e.g., Winston v. City of New York,* 759 F.2d 242, 245 (2d Cir.1985); *see also Savina Home Industries v. Secretary of Labor,* 594 F.2d 1358, 1366 (10th Cir.1979). The mere fact that Plaintiffs have claimed a chilling of their due process rights, rather than specific instances of actual deprivation of such rights, does not preclude them, as a matter of law, from bringing this claim.

The Court agrees, however, with Defendants' argument that Plaintiffs' discussion of the facts underlying the due process claim is premature, in light of the stipulation made by the parties and submitted to the Court for present consideration. Paragraph 54 of the Stipulated Record states:

> Although the parties agree that counsel and consultants were employed by the two representative plaintiffs ... the parties disagree as to whether it was essential, in order to insure to hospitals fundamental due process in their dealings with the Commission, for the hospitals to employ counsel and outside technical consultants to assist them with filings, negotiations, or administrative proceedings before the Commission. *If this question is dispositive with respect to Plaintiffs' due process claim concerning whether the Commission is constitutionally required to order that charges for hospital services shall include the cost of attorneys' and consultants' fees, further fact finding by the Court will be necessary.*

Plaintiffs have indicated that the Court's inquiry should follow the three-pronged inquiry identified in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), to evaluate a claim that procedural due process protections have been denied. The *Mathews* inquiry, however, requires a detailed probing of the facts underlying the due process claim.[19] Since the parties have stipulated that further fact finding is required in order for the Court to evaluate whether due process considerations are met in the Commission's provision for legal fees, it would be premature for the Court to address this due process claim substantively without providing the parties with an adequate opportunity to enlighten the Court on the facts of this matter at trial.

## IV. ORDER

In accordance with the analysis set out above, it is *ORDERED* that judgment be, and it is hereby, *GRANTED* in favor of Defendants on Counts I, II, III, and IV. The Court further *ORDERS* the parties to proceed to trial on Count IX, along with the remaining counts of Plaintiffs' complaint.

---

**19.** The *Mathews* factors are: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the government's interest in the functions involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 335, 96 S.Ct. at 903.